621 So.2d 141 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Stephen F. TAYLOR, Defendant-Appellant.
No. 24947-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*144 Higgins & Starling by George L. Higgins, III and A. Gregory Riley, Pineville, for defendant-appellant.
Richard Ieyoub, Atty. Gen., Walter E. May, Jr., Dist. Atty., and C. Glenn Fallin, Asst. Dist. Atty., for plaintiff-appellee.
Before NORRIS, HIGHTOWER and STEWART, JJ.
NORRIS, Judge.
The defendant, Stephen Floyd Taylor, appeals his conviction for manslaughter. La. R.S. 14:31. Taylor was convicted as charged by a unanimous jury and was subsequently sentenced to 90 months at hard labor with credit for time served. For the reasons expressed, we affirm the conviction and sentence.

*145 FACTS
At some time between 5:00 and 5:30 p.m. on August 9, 1991, Steve Taylor and his wife Pamela Jo went to the Claiborne Parish residence of Steve's ex-wife, Ann Taylor. Steve and Ann had argued over the telephone earlier that day regarding the time that Steve would be returning their daughter. Upon arriving at Ann's house, Steve refused to give that month's child support check to his daughter, insisting that Ann come out to the car to get it. At Steve's request, Ann came out to the car to receive the check. After Steve and Ann exchanged unpleasantries, Steve put the car in reverse and began to back out of the driveway. At the same time, David and Judy Lyon pulled into the driveway, and the two vehicles bumped into each other.
After Steve Taylor jumped out of his car and proceeded to the rear, he was met by David Lyon who, according to at least one witness, attempted to restrain Taylor by "bear hugging" him. The two men struggled briefly before Taylor drew a pistol and fired a total of four shots into Lyon's chest and abdomen. Lyon was later taken to North Claiborne Hospital where he was pronounced dead from multiple gunshot wounds.
At trial, Ann Taylor testified that after the cars bumped, Steve looked in the rear view mirror, jumped out of his car with a furious look on his face, and started toward the rear of his car. (R.p. 124) She had seen that expression on Steve's face numerous times while they were married and knew that he was "mad." (R.pp. 124-25) David Lyon then jumped out of his car, ran up to Steve, and threw his arms around Steve in a "bear hug." She stated that she had one hand on the shoulder of each man in an attempt to separate them and that she never saw either one of them choking the other. The two men struggled for a short time before Steve pulled out a gun which he customarily carried, pointed it into David's stomach, and fired. David threw his arms up and leaned back. Steve then ran toward the house and fired several more shots over his shoulder at David. Ann initially stated that these later shots were fired from a distance of 2 to 3 feet; however, on cross examination, she said it was 10 to 15 feet. (R.pp. 126, 138) She further stated that she heard the gun "clicking" as Steve continued to fire without ammunition.
Judy Lyon, the victim's wife, testified that David was face to face with Steve and wrapped his arms around Steve in order to restrain him. (R.p. 148) She did not see any blows; nor did she see either of them choking the other. After the two struggled for a while, she heard a shot. David threw his arms up, and the two moved apart. Steve ran forward while David moved backward. Steve then turned around and fired more shots at David. (Later, she said that the first three shots were fired "point blank" and the fourth was fired from 6 feet away.) David walked toward Ann Taylor's car, asked someone to get him to a hospital, and fell face down in the dirt. Steve then remarked to Judy as she ministered to her husband, "`Y'all can call the doctor for him if you want to, but he's not with it.'" (R.p. 150)
Pamela Jo Taylor, the defendant's wife, testified that after the two vehicles bumped, Steve did not run but walked to the rear of his car. She remained seated in the car. When she turned around, she saw David running toward their car with a "growl" on his face. She could only see Steve's back against the door with David's face over him. She stated that she got scared and grabbed another gun located under the driver's seat. She got out of the car and walked around to the front left corner of the car where the two men were now struggling at the driver's side door. She said that Steve's backside was toward her and that David had him around the neck. She heard a single shot, turned around, and ran to the other side of the car. She then heard three more shots. When she turned around, she saw the two men standing face to face. At that time, Steve ran toward the house. David did not run after Steve, but stood still and threw his hands up. Only then did David run to the front of the car where he turned and fell. Pamela Jo further stated that once Steve started to run toward the house, she never *146 saw him point the gun at David again; nor did she hear any "clicking" sound or see him pull the trigger again.
Steve Taylor testified that he had known David Lyon for several years. He said that Lyon had interfered in his divorce with Ann and had helped her steal some of his property. He stated that he had a "run in" with David at church a few days after his divorce which resulted in him punching David. However, he said that he had not had any problem with David in the three years since that incident.
Taylor did not deny killing Lyon but maintained that he did so in self defense. According to Taylor, after the two cars collided, he walked to the rear of his car and bent over to look underneath. He heard a loud "growl" and the shuffle of Lyon's feet as Lyon came at him from behind. He stated that Lyon shoved him into the car, causing $300 worth of damage to the car. However, when asked to point out the damage to the car in a photograph, he was unable to do so. (R.p. 319) Lyon then grabbed him from the rear, placing his left arm around Taylor's neck while delivering blows with his right hand. Taylor said he was in a bent position and was suspended with his feet not completely flat on the ground. He further said he thought he was strangling to death. He elbowed Lyon in the stomach and attempted to rise. Although he was unable to straighten from the bent position, he did manage to turn around and face Lyon. He attempted unsuccessfully to reach and squeeze Lyon's "privates." He stated that he thought he was going to die, so he pulled out his gun, pushed it into David's stomach, and pulled the trigger. (R.p. 274) However, the gun did not fire on this first attempt, so he pulled the trigger again, this time shooting David in the stomach. He stated that he purposely shot David in the stomach because he knew it would not kill him.
Steve admitted that after he fired the first shot, David no longer had him in his grip. He stated that he ran as soon as he was free but that he shot Steve three more times because he "couldn't get free from his aggression." (R.p. 297) He said that one of these later shots hit his own hand. Steve also admitted that he might have continued to pull the trigger even after he had run out of ammunition. He stated that after he had emptied the first gun he got another gun from his wife because he thought David was getting one. However, he conceded that he never saw a weapon on David and did not know where David might have gotten a gun.
Officer Mike Walker of the Haynesville Police Department testified that when he arrived at the scene, Steve Taylor approached him and stated that he had to shoot Lyon because he was choking him to death. (R.p. 69) Officer Walker retrieved Taylor's .380 caliber automatic pistol and turned it over to Claiborne Parish Sheriff's Deputies who later recovered four spent shells approximately 8 feet from the driver's door of Steve Taylor's car. After noticing that Taylor's left hand had been injured, but before placing him under arrest, Officer Walker drove Taylor to the North Claiborne Hospital emergency room. En route to the hospital, Taylor asked the officer whether he noticed that his voice was hoarse. When the officer responded that he did, Taylor told him that he should remember that fact. (R.p. 79)
Deputy Chuck Talley of the Claiborne Parish Sheriff's Office took Taylor into custody at the hospital as he waited to see a doctor. Taylor was eventually seen by Dr. Samuel Abshire, the physician on duty that evening and also assistant coroner for Claiborne Parish. Dr. Abshire was called to testify as a state witness at trial without objection. He stated that his examination of Taylor revealed a gunshot wound to his left hand, a superficial abrasion on his left collar bone, and two or three small abrasions on his left shoulder blade. The doctor further stated that Taylor twice requested that he examine his neck. Taylor explained as the reason for his requests that Lyon had grabbed him from behind and choked him, compressing his windpipe and causing him to gasp for breath. (R.p. 185) After examining Taylor's neck, Dr. Abshire found nothing compatible with a choking injury.
*147 Taylor returned to Dr. Abshire on August 12, 1991 for follow up on the gunshot wound to his hand. The doctor examined his upper body and noted a minimal edema with minimal swelling in the area of his left collarbone. The abrasion on his back was still present but healing well. Taylor pointed out two small scratches on his head which the doctor had not noticed in the original examination. Taylor asked Dr. Abshire once again to examine his neck; the doctor found it freely movable and soft. He stated that Taylor made subjective complaints of tenderness over his Adam's Apple, but noted that most people experience such tenderness. Taylor also asked the doctor if he could detect hoarseness in his voice. However, the doctor, being unfamiliar with Taylor's voice, was unable to discern any hoarseness.
Unsatisfied with Dr. Abshire's findings, on August 13, 1991, Taylor went to Dr. Larry Horn, a chiropractor, who testified at trial for the defense. He stated that Taylor had been a patient of his since 1981. On the August 13, 1991 visit, Dr. Horn noted the gunshot wound to Taylor's left hand, as well as a laceration on his right cheek and jaw, and abrasions to his left collarbone region. Taylor complained of a "cooling effect" when he breathed and explained that he had been attacked from behind and choked. Upon examination, the doctor noted bruising on the left side of his neck and muscle spasms in the neck and shoulder region. The doctor noted that muscle spasms are an objective finding which cannot be faked. He said that suppression of the esophagus and windpipe causes the neck muscles to spasm, and he considered Taylor's spasms to be a possible post-strangulation or suffocation reaction. He attributed the "cooling effect" to the choke hold and stated that he did not think anything else could cause such a problem. (R.p. 174)
Following a jury trial in June 1992, Taylor was convicted of manslaughter. He subsequently filed motions for a new trial and for a post verdict judgment of acquittal. After an August 19, 1992 hearing, the trial judge denied both motions and on August 26, 1992 imposed a sentence of 90 months at hard labor. Taylor now appeals.

DISCUSSION
Taylor raises 11 assignments of error, of which one is duplicated and two are not briefed. Assignments of error which are neither briefed nor argued are considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La. 1978); State v. Kotwitz, 549 So.2d 351 (La. App. 2d Cir.1989), writ denied 558 So.2d 1123 (1990). Thus, we do not consider Taylor's second, seventh, or ninth assignments of error.

Sufficiency of Evidence
Taylor asserts that the evidence introduced at trial was insufficient to support his conviction of manslaughter and to exclude his claim of self-defense.
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (1992).
When circumstantial evidence is used to prove the commission of the offense, every reasonable hypothesis of innocence must be excluded as to that element of the crime which the circumstantial evidence tends to prove. La.R.S. 15:438. However, this rule does not establish a standard of appellate review separate from that set out in Jackson. State v. Wright, 445 So.2d 1198 (La.1984); State v. Chism, 436 So.2d 464 (La.1983). Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where *148 circumstantial evidence is used to convict. State v. Wright, supra.
The elements of manslaughter, as charged in the instant case, are set forth in La.R.S. 14:31 A(1):
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
Both first degree and second degree murder require proof of specific intent to kill or to inflict great bodily harm. La.R.S. 14:30, 14:30.1. Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Although intent is a question of fact, it need not be proven as a fact; instead, it may be inferred from the circumstances of the transaction. State v. Fuller, 414 So.2d 306 (La.1982); State v. Perow, 616 So.2d 1336 (La.App. 2d Cir. 1993).
When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Flowers, 574 So.2d 448 (La.App. 2d Cir.), writ denied 580 So.2d 666 (1991). On review, the standard is whether a rational fact finder, after viewing the evidence in the light most favorable to the state, could have found beyond a reasonable doubt that the homicide was not committed in self-defense or the defense of others. Jackson v. Virginia, supra; State v. Matthews, 464 So.2d 298 (La.1985); State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.), writ denied 508 So.2d 64, 65 (1987).
La.R.S. 14:20 provides, in relevant part, that:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger[.]
La.R.S. 14:21 further provides that:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
On the instant record, there is more than ample evidence, when viewed in the light most favorable to the state, for the trier of fact to conclude beyond a reasonable doubt that Taylor did not act in self-defense when he shot and killed Lyon. The jury could have reasonably determined that Taylor was the aggressor or the person who "brought on the difficulty," and was thus barred from claiming self defense altogether. La.R.S. 14:21; State v. Simmons, 414 So.2d 705 (La.1982); State v. Johnson, 514 So.2d 684 (La.App. 2d Cir. 1987); State v. Jones, 598 So.2d 511 (La. App. 1st Cir.1992).
Taylor admitted that Lyon had interfered in his divorce with Ann and that Lyon had helped her steal property from him. He further admitted that he punched Lyon at church a few days after obtaining the divorce. Given Taylor's stormy relationship with Lyon, coupled with his recent argument with his ex-wife, the jury could have determined that Taylor was angry as he advanced upon Lyon; Lyon, who was unarmed, simply tried to restrain him with a "bear hug." Such a finding is consistent with the testimony that Taylor had a furious expression on his face and was "mad" when he jumped out of his car, heading toward Lyon. Although it is not every act or insulting word of a defendant that makes him an aggressor, this determination belongs to the jury whose province it is to examine the act and intentions of the defendant. State v. Coll, 146 La. 597, 83 So. 844 (1919); State v. Gonday, 442 So.2d 703 (La.App. 1st Cir.1983).
Considering that Taylor fired three shots at Lyon (and attempted to fire more but *149 ran out of ammunition) after he had already shot him once and been released from his grasp, a rational trier of fact might well have concluded that Taylor, from the outset and in the heat of passion, actively desired to kill or cause great bodily harm to Lyon. See State v. Rosiere, 488 So.2d 965 (La.1986); State v. Neslo, 433 So.2d 73 (La.1983); State v. Perow, supra.
Moreover, even if the jury felt that Taylor was not the aggressor, they could have found that he was not reasonable to believe that he was in imminent danger of losing his life or receiving great bodily harm when he shot and killed Lyon. All of the witnesses, including the defendant, agreed that Lyon was unarmed. Ann Taylor, Judy Lyon, and Pamela Jo Taylor each stated that they never saw Lyon strike the defendant, only "hug" him. Judy Lyon said that Lyon was "restraining" Taylor. Of the three women, only defendant's wife stated that Lyon "had him [Taylor] ... around the neck." (R.p. 246) Ann Taylor and Judy Lyon both testified that they did not see either man choking or striking the other. Although Drs. Abshire and Horn disagreed as to the presence of physical signs of choking, the jury apparently found Dr. Abshire more credible than Dr. Horn or believed that the additional physical signs Dr. Horn described occurred subsequent to the incident. Whenever there is conflicting testimony as to factual matters, the question of credibility of witnesses is within the sound discretion of the trier of fact; such factual determinations will not be disturbed on review unless clearly contrary to the evidence. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Perow, supra; State v. Tate, 543 So.2d 1093 (La.App. 2d Cir.), writ denied 551 So.2d 629 (1989). Thus, the evidence, viewed in the light most favorable to the state, was sufficient for the jury to conclude that Taylor could not have reasonably believed himself to be in imminent danger of death or great bodily harm and that deadly force was unnecessary. See State v. Stevenson, 514 So.2d 651 (La.App. 2d Cir.1987), writ denied 519 So.2d 141 (1988); State v. Jackson, 452 So.2d 1225 (La.App. 2d Cir.1984).
Finally, even if the jury felt that Taylor was justified in sensing imminent danger of losing his life or receiving great bodily harm, this fear was reasonable only as long as Lyon had him in his grasp. See State v. Stevenson, supra. This possible justification was removed when Lyon released him after the first shot. The eyewitnesses, including defendant himself, uniformly testified that after defendant fired the first shot into Lyon's stomach, Lyon raised his arms, released Taylor, and never touched him again. In spite of this, Taylor fired three more shots into Lyon's chest and abdomen. Compare State v. Gonday, 442 So.2d at 706 n. 5. Under this analysis, only the first shot was arguably justified. Although the record does not reveal exactly which shot killed Lyon, but reflects only that he died from multiple gunshot wounds, the jury could have reasonably determined that the later shots, at least two of which entered Lyon's chest, hastened or contributed to his death. See State v. Mosely, 475 So.2d 76 (La.App. 2d Cir.1985); State v. Gremillion, 529 So.2d 497 (La.App. 3d Cir.1988), reversed on other grounds 542 So.2d 1074 (1989). Such a determination is consistent with the fact that Lyon remained standing after the initial shot. On this basis, the jury could have rejected Taylor's self-defense argument.
We conclude a rational trier of fact could have found the state proved beyond a reasonable doubt that Taylor was guilty of manslaughter and that the homicide was not committed in self-defense. See State v. Freeman, 521 So.2d 783 (La.App. 2d Cir. 1988); State v. Stevenson, supra.

The Physician-Patient Privilege
Dr. Abshire testified, without objection, as to the physical findings yielded in his examination of Taylor. However, when the state asked whether Taylor had related how he was shot, defense counsel objected on the basis of the physician-patient privilege. The court overruled the objection, and Dr. Abshire went on to testify from his examination notes. The substance of this testimony was repeated at trial by other *150 witnesses, including defendant, with only two exceptions: the doctor stated that Taylor told him Lyon wrestled him to the ground and that his (Taylor's) hand was hit with the first bullet fired.
Taylor argues on appeal that the trial court erred in permitting Dr. Abshire to testify, without waiver of the physician-patient privilege, about inculpatory statements he made to the doctor. La.R.S. 15:476[1] provides in relevant part:
[N]o physician is permitted, whether during or after the termination of his employment as such, unless with his patient's express consent, to disclose any communication made to him as such physician by or on behalf of his patient, or the result of any investigation made into the patient's physical or mental condition, or any opinion based upon such investigation, or any information that he may have gotten by reason of his being such physician. The provisions of this Section shall not apply to any physician, who, under the appointment of the court, and not by a selection of the patient, has made investigation into the patient's physical or mental condition[.]
The state urges that the privilege does not apply because: (1) Taylor himself did not seek the treatment of Dr. Abshire but was taken to the doctor by the police; (2) Taylor was accompanied to the emergency room by an officer and could not have expected the information he related to the doctor to be confidential. Neither of these arguments has merit.
The patient claiming the physician-patient privilege must have voluntarily consulted the physician for diagnosis or treatment, and whether that person was in custody at the time is irrelevant. See State v. Carter, 383 So.2d 357 (La.1980); State v. Walker, 376 So.2d 92 (La.1979); State v. Berry, 324 So.2d 822 (La.1975); Comment, Disclosure of Medical Information Under Louisiana and Federal Law, 65 Tul. L.Rev. 169, 174 (1990).
In Carter, the defendant, suffering a gunshot wound, went to the hospital for treatment. On the basis of an earlier complaint, he was arrested there by police officers. Some time after the arrest was made, he was seen by an emergency room physician. The doctor asked the defendant how he had received the gunshot wound; he candidly replied that he had attempted to rob a lady, and she had shot him. The court found the defendant's statement privileged even though he was under arrest at the time it was made. The fact that the defendant's examination followed his arrest, held the court, did not constitute the type of in-custody examination contemplated in Berry. The court drew a distinction between examinations made incident to arrest for the purpose of determining a defendant's health prior to incarceration and examinations which are necessary "to provide medical treatment." Carter, 383 So.2d at 359. See Pugh & McClelland, Developments in the Law, 1979-80, Evidence, 41 La.L.Rev. 595 (1981).
Dr. Abshire needed to ask Taylor the cause of the injury in order to treat it. The mere fact that Taylor had been taken into custody before he saw the doctor does not exclude his statements from the privilege. The more relevant inquiry is whether Taylor voluntarily consulted the doctor.
The state essentially argues that because Taylor was driven to the emergency room by the police, he did not voluntarily consult the doctor for the examination and treatment of his wound. We cannot accept this reasoning. The testimony clearly establishes that Taylor, who repeatedly asked the doctor to extend the examination to other areas of his body, was eager to receive both the examination and the treatment. Moreover, Taylor had already established a doctor-patient relationship with Dr. Abshire several years before. (R.p. 186) Thus, we conclude that the examination and treatment administered to Taylor by Dr. Abshire constituted a voluntary consultation.
The state further contends that the privilege does not apply because Taylor was accompanied to the emergency room by a policeman and could not have intended the *151 information he related to the doctor to be confidential. However, there is nothing in the record to indicate that any policeman was actually present when Taylor gave his statement to Dr. Abshire. Indeed, the record seems to suggest just the opposite. After arriving at the hospital and before seeing the doctor, Taylor terminated communication with the police, requesting to speak with his attorney. It is quite unlikely that Taylor would have related the details of the shooting to the doctor in the presence of the police. At any rate, the state has failed to prove otherwise. See Carter, supra (holding the privilege applicable even though defendant was accompanied by two policemen and statement was made in the frenetic emergency room of New Orleans Charity Hospital).
Accordingly, we find that the statement made by Taylor to Dr. Abshire was privileged under R.S. 15:476 and should not have been admitted over the objection of Taylor's counsel. In determining whether the erroneous admission of evidence requires reversal of a defendant's conviction, the proper standard of review is whether there is a reasonable possibility that the evidence might have contributed to the verdict. State v. Gibson, 391 So.2d 421 (La.1980); State v. Bailey, 514 So.2d 741 (La.App. 2d Cir.1987). Further, the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Gibson, supra; Bailey, supra.
With two minor exceptions, the substance of Taylor's statement to Dr. Abshire was repeated by other witnesses, including Taylor himself. Far from prejudicing Taylor, testimony that he was wrestled to the ground and that he shot his own hand with the first bullet, if believed by the fact finder, would tend to strengthen his self-defense claim. The statement is exculpatory, not inculpatory. Thus, we conclude that the evidence was harmless beyond a reasonable doubt. This assignment lacks merit.

Relevancy Matters
Taylor asserts that the trial court erred in admitting evidence as to the strained relationship between him and his ex-wife, Ann Taylor. More specifically, Taylor contends that both evidence of the volatile nature of his divorce and of an argument that took place between him and Ann shortly before the shooting was irrelevant and prejudicial.
Ann Taylor testified that, during a telephone conversation at about 5 p.m. on the day of the homicide, she had a disagreement with defendant over when he was to return their daughter. She stated that defendant was "kind of ugly on the phone." (R.pp. 114-15) Defendant objected on the grounds of materiality and relevance. The state responded that the relevance was to show defendant's state of mind. The court noted that the conversation had occurred less than half an hour before the homicide and overruled the objection. (R.p. 117)
Later in her testimony, Ann Taylor testified that when defendant jumped out of his car he had a furious expression on his face. The prosecutor asked what defendant's expression indicated. Defense counsel objected that the answer would be immaterial and irrelevant. (R.p. 124) The court overruled the objection. Ann said defendant's expression indicated he was mad. (R.p. 125)
La.C.E. art. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A trial judge is vested with wide discretion in determining relevancy of evidence. His ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981); State v. Hayes, 585 So.2d 619, (La.App. 2d Cir.1991). When a witness gives an opinion of a defendant's emotional state, the propriety of the testimony must be examined in the context of the statement and the testimony as a whole. State v. Williams, 497 So.2d 333 (La.App. 2d Cir.1986), writ denied 499 So.2d 81 (1987).
*152 The defendant's state of mind is an essential element of the crime of manslaughter. Whether defendant's passions were aroused or he was able to cooly reflect upon his actions was clearly at issue in the instant case. Thus, the trial judge's finding that this evidence was relevant did not constitute an abuse of discretion.
Taylor also complains that during the testimony of Pamela Jo, his current wife, the state impermissibly attempted to cloud the issues and inflame the jury by depicting him as a "hot head" who had been in court on a civil dispute with his ex-wife on the day before the shooting.
On cross examination, the prosecutor asked Pamela Jo if she knew that defendant and his ex-wife had been in court on a civil matter on the day before the homicide. Defense counsel objected that the matter was outside the scope of direct examination, immaterial and irrelevant. The state argued that the testimony was relevant to show that defendant had cause to be irritable or upset when he was with his ex-wife the next day. The court overruled the objection. (R.p. 258) Pamela Jo testified that she was indeed aware that the two had been in court the day before and that defendant had tried but failed to get a permanent restraining order to keep Ann from taking their daughter out of state.
The flaw in Taylor's argument is that his own counsel opened the door for this testimony. When he cross examined Ann Taylor, defense counsel asked about their litigation involving child custody and support. (R.p. 127) At that point in the trial, defense counsel argued that such testimony was relevant. Moreover, immediately before the prosecutor asked the questions about which defendant complains, defense counsel had elicited testimony from Pamela Jo on direct examination that defendant was not upset on the day of the homicide when he went to his ex-wife's house. (R.p. 239)
The prosecutor's questions appear to be appropriate for cross examination. The relevance of defendant's state of mind is abundantly clear. On the showing made, the trial court did not abuse its discretion in admitting the testimony challenged by defendant. This assignment lacks merit.

The Court's Comment
On cross examination of Ann Taylor, defense counsel asked where her hands were when she was trying to separate the defendant and Lyon. When Ann responded that she had one hand on each man's shoulder, defense counsel attempted to contradict her, stating that she had testified differently minutes before. (R.p. 131) The prosecutor objected, arguing that defense counsel was misstating her previous testimony. The court responded, "Sustained. That's what she said, Mr. Culpepper." Defense counsel replied, "Okay. Okay." He made no contemporaneous objection to the court's comment. Taylor now asserts that the comment violated the prohibition of La. C.Cr.P. art. 772[2] and constitutes reversible error.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La.C.Cr.P. art. 841; State v. Jackson, 523 So.2d 251 (La.App. 2d Cir.), writ denied 530 So.2d 565 (1988). Even if defense counsel had made a contemporaneous objection, the comment was innocuous, had no bearing on defendant's guilt or innocence, and would have constituted no more than harmless error. See State v. Hodgeson, 305 So.2d 421 (La. 1974). This assignment lacks merit.

Reputation Evidence of Character
Sue Ellen Kirk testified as a rebuttal witness for the state. She stated that she had lived next door to Ann Taylor for 15 years, including the time during which Ann and defendant were married. (R.p. 322) She testified, over defense counsel's objection, that defendant's reputation in the *153 community for truthfulness and veracity was that "he's not a very truthful man, that he will tell a lie when the truth would be better." (R.p. 323) She also testified, again over objection, that defendant had a reputation for losing his temper very quickly. (R.p. 328) Defendant asserts that the trial court erred when it permitted the state to introduce this character evidence.
An accused who takes the stand is subject to impeachment by discreditation as is any other witness. La.C.E. art. 607A; State v. Vessell, 450 So.2d 938 (La.1984). If the accused takes the stand he places his credibility at issue. State v. Frentz, 354 So.2d 1007 (La.1978). Thus, by taking the stand to testify on his own behalf, Taylor not only placed his credibility at issue, but opened the door for attack on his credibility by the introduction of reputation evidence.
La.C.E. art. 608 A provides the method by which a witness's credibility may be attacked:
The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness.
(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
(3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
The prosecution's qualification of Mrs. Kirk as a character witness left much to be desired, as it drew only two assertions from her: (1) that she had lived next door to defendant for a number of years, and (2) that she had heard defendant's reputation as to truth and veracity discussed in the community. (R.pp. 322-23) The trial court apparently concluded that these rather general assertions formed a sufficient foundation for Mrs. Kirk to testify about defendant's reputation and overruled defense counsel's objection. Without more, this assignment might have given us cause for concern. See, e.g., State v. Jenkins, 456 So.2d 174 (La.App. 2d Cir.), writ denied 460 So.2d 1043 (1984). However, Mrs. Kirk later testified that she had learned of defendant's reputation through discussions with his family members, their pastor, students at school, and Haynesville Mayor Tom Crocker. (R.pp. 330-31) This additional testimony was certainly sufficient to establish a proper foundation for the reputation evidence offered by the prosecution to attack defendant's credibility.
Defendant also disputes the propriety of Mrs. Kirk's testimony regarding his reputation for losing his temper quickly. La.C.E. art. 405 provides that in all cases in which evidence of a trait of character is admissible, proof may be made by testimony as to general reputation only. If an accused offers evidence of a pertinent character trait, the prosecution has the right to rebut it. La.C.E. art. 404 A(1). Considering the charge involved in this case and the trial testimony as a whole, it is clear that whether defendant was impassioned when he shot Lyon was a material issue. Defendant apparently recognized this fact when he repeatedly stated that he was "not mad" in the events leading up to the shooting. (R.pp. 265-67, 306-07)
Defendant's repeated denials of anger under the most trying circumstances were plainly intended to create an impression that he was a man of cool reflection, not given to quick temper. By offering such testimony, the defendant opened the door to rebuttal evidence. See State v. Singletary, 461 So.2d 481 (La.App. 3d Cir.1984). The reputation evidence offered by Mrs. Kirk was offered only to refute defendant's own characterization of himself. As discussed above, the state laid an adequate foundation for this testimony. Thus, the court did not abuse its discretion in permitting the state to introduce character evidence based on defendant's reputation. This assignment lacks merit.

*154 Sentencing Errors

Taylor asserts that the trial court erred in failing to particularize and individualize his sentence as required by the Louisiana Sentencing Guidelines and La.C.Cr.P. art. 894.1. At the time sentence was imposed, defense counsel made an oral motion to reconsider, objecting that the sentence was excessive and preserving the issue for appeal. (R.p. 408)
After noting that defendant had no prior convictions, the court correctly found that defendant's designated grid cell was 1-G. That grid cell is the lowest cell available for the crime of manslaughter and recommends a sentence of 60-90 months. Because Taylor's sentence of 90 months was within the grid range, no further elaboration was required. La.S.G. § 201C. Contrary to defendant's assertion, the court stated that it considered both aggravating and mitigating factors and found none that would impact its grid cell selection. (R.pp. 407-08)
Based on the instant record, a sentence of 90 months is not excessive. This assignment is without merit.

Error Patent
La.C.Cr.P. art. 930.8 provides that at the time of sentencing the trial court shall inform the defendant of the prescriptive period for post conviction relief. The record shows the court did not so inform defendant. This defect has no bearing on the sentence and is not grounds to reverse the sentence or remand the case for resentencing. La.C.Cr.P. arts. 921, 930.8(C); State v. Cox, 604 So.2d 189 (La. App. 2d Cir.1992). Rather, the district court is hereby ordered to give defendant written notice of the prescriptive period for applying for post conviction relief within 10 days of the rendition of this opinion and to file defendant's receipt of such notice in the record of the proceedings. See State v. Mock, 602 So.2d 776 (La.App. 2d Cir.1992); State v. Smith, 600 So.2d 745 (La.App. 2d Cir.1992); State v. Powell, 598 So.2d 454 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (1992).

CONCLUSION
For the reasons assigned, the conviction and sentence of Stephen Floyd Taylor are affirmed.
AFFIRMED.
NOTES
[1] The substance of this statute is now found at La.C.E. art. 510.
[2] Article 772 provides that:

The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.