654 So.2d 455 (1995)
STATE of Louisiana
v.
William Jerome TERRY, III.
No. KA 94 0622.
Court of Appeal of Louisiana, First Circuit.
April 7, 1995.
*456 Premila Burns, Gwendolyn K. Brown, Dist. Attys. Office, Baton Rouge, for appellee State of La.
David Price, Office of Public Defender, Baton Rouge, for defendant-appellant William Terry.
Before FOIL, WHIPPLE and KUHN, JJ.
WHIPPLE, Judge.
Defendant, William Jerome Terry, III, was charged by grand jury indictment with aggravated rape (count one) and attempted second degree murder (count two), violations of LSA-R.S. 14:42, LSA-R.S. 14:27 and LSA-R.S. 14:30.1, respectively. Defendant was tried by a jury, which acquitted him of the aggravated rape charge and found him guilty as charged of attempted second degree murder. The trial court sentenced defendant to imprisonment at hard labor for fifty years. Defendant has appealed, urging ten assignments of error, as follows:
1. The trial court committed error by allowing State Exhibit S-56 to be admitted into evidence and denying defendant's motion for mistrial.
2. The trial court committed error by refusing to allow evidence of the victim's history of domestic violence.
3. The trial court committed error by allowing the state to question a witness with leading questions.
4. The trial court committed error by refusing to allow evidence of the victim's reputation for untruthfulness.
5. The trial court committed error by refusing to allow evidence that defendant knew of fights between the victim and her family.
6. The trial court committed error by refusing to allow evidence of violence by the victim.

*457 7. The trial court committed error by accepting a verdict not supported by sufficient evidence.
8. The trial court committed error by denying defendant's Motion for New Trial.
9. The trial court committed error by denying defendant's Motion for Post Verdict Judgment of Acquittal.
10. The trial court committed error by imposing an excessive sentence and failing to consider the sentencing guidelines of LSA-C.Cr.P. art. 894.1.
Defendant expressly abandoned assignments of error numbers one, three, seven, eight and nine in his appellate brief.
During the night of August 26, 1992, a black male came to a nursing home in East Baton Rouge Parish where Henry Aucoin, a charge nurse, was at work. The black male told him there was a female who had been attacked at an apartment building behind the nursing home and that she needed help. Aucoin called the 911 emergency service line.
In response, Baton Rouge City Police Officer J. Foley and Reserve Officer Gary Marino went to the 4700 block of Annette Street. Defendant, an individual with whom the victim previously had a romantic relationship, was standing on the corner across the street from the apartment building, which was vacant and abandoned. Defendant advised the officers that he was the individual who was responsible for the emergency call. At defendant's direction, the officers entered the apartment building. They found the thirty-four year old female victim lying on the floor in one of the apartments. She was bleeding, had sustained numerous injuries and was unable to tell the officers anything. The victim, accompanied by defendant, was transported to the hospital. Later, Officer Ben Odom interviewed the victim at the hospital; and during the interview she identified defendant as her assailant. Defendant's arrest followed.
The victim's testimony reveals the following version of the facts. She spoke with defendant on the telephone shortly before the instant incident, to let defendant know that she would be a witness for him in his endeavor to obtain unemployment compensation. At about 11:45 p.m. on August 25, approximately twenty minutes after the call, defendant drove up to the house where the victim was staying. She answered defendant's knock at the door. Defendant declined her offer to come inside the house, indicating he wanted to remain in the car. She got into the car with defendant but was not planning to leave the residence. Once inside the car, their conversation was initially friendly. Defendant attempted to kiss her. She "jerked away" from him. Defendant grabbed her by her neck, locked the car door, started the car, and drove off, taking her to the apartment building. Defendant told the victim that he was going to kill her. He parked the car, exited it and pulled the victim out of the car. Outside the apartment building, defendant slapped her. Her head hit a brick area, and one of her earrings fell out. Defendant pulled her into the apartment building.
When defendant got the victim into the apartment building, he picked up a piece of pipe and used it to hit her at least three times on her head. She fell to her knees, and defendant used the pipe to hit her across her back. After she had fallen, defendant hit her across her face and on her legs with the pipe. Defendant rolled her over and pulled off her tights and underpants. Defendant performed oral sex on her, and had vaginal sexual intercourse with her. At the time, she could not move and did not consent to having intercourse. She was telling defendant to stop and to get off of her.
Defendant then picked up the victim and carried her into another part of the apartment. At some point, defendant said he was going to get beer for them and left. Her intention was to get out of the building, but she could not see where she was and could not walk. She did crawl but was unable to exit the building. When defendant returned to the building, he gave her a soft drink and helped her to drink it. He also made her smoke a cigarette. When she finished the soft drink, defendant told the victim that it was time for her to die.
When defendant returned to the building, he also had a pack of razor blades with him, which he used to cut the victim's wrists. *458 Defendant threatened to cut her throat. He took a gold chain that she was wearing around her neck, telling her that "where you're going you won't need it." Defendant shaved or cut off the victim's hair and had nonconsensual anal sexual intercourse with her. Defendant was constantly telling her that he was going to kill her and that she had to die, was going to die and was "not leaving the place." Defendant wrapped her in a "carpet or whatever it was." Defendant told her he was glad she was going to die. The victim stated that she thinks that at some point defendant left the building again. She indicated that at times she would lose consciousness and then regain it and lose it.
At some point, the victim told defendant how much she wanted to live, that she loved him, forgave him and wanted to go to the hospital. She also told defendant that she had some money and would give it to him. She indicated to defendant that all he had to do was get her medical attention and that she would not tell the police what he had done to her. Instead, she would say that "some guys" had attacked her. According to the victim, defendant believed her and went for help. Defendant later returned to the building, told her help was on the way and threatened her if she later told the police what he had done. When the ambulance transported her to the hospital, defendant accompanied her.
Several physicians attended to the victim at Earl K. Long Charity Hospital where she was taken. The victim suffered numerous injuries, including a pneumothorax (collapsed lung) and trauma (both blunt and penetrating) to her head, neck and chest. There were lacerations to her scalp and lacerations of both wrists, which included severed tendons, nerves and arteries. She suffered a fractured rib and fractures of her right hand. The victim also had fractures to her face, a right zygomatic complex fracture, a small fracture of the right maxillary buttress and an isolated zygomatic arch fracture on her left side. Several surgeries were required as part of the victim's treatment. According to the victim, she suffered permanent loss of all use of her left hand and loss of movement in two fingers on her right hand.
Several of her attending physicians gave testimony indicating that if she had not received medical treatment she could have bled to death. Due to the severe blood loss she had sustained, the victim's treatment included transfusions of four units of blood, representing replacement of the victim's loss of sixty percent of her blood volume.
Defendant took the stand at trial in his own defense and presented an entirely different version of the facts pertaining to the instant incident than that related through the victim's testimony. A summary of defendant's version follows. When defendant spoke to the victim on the telephone on August 25 or 26, she told him that she had seen him talking to another female and that he had "better watch [his] back." According to defendant, he did not take the victim's statement seriously. At the invitation of the victim, defendant drove to the victim's aunt's home to have a few beers with the victim. When he arrived at her aunt's home, the victim came out and hugged him. They got into the car, sat and drank beer.
From there they went to a convenience store to get more beer. After stopping at a second convenience store where the victim got some more beer, they proceeded to the vacant apartment building at the victim's direction. When they exited the car at the apartment building, one of the victim's earrings fell on the ground outside. Defendant looked for the earring; and, when he was unable to find it, the victim told him that they could find it later. They then went inside the building. Both of them removed their clothes and "had sex." After they moved to another room in the building, they had sexual intercourse (vaginally) again and drank some more. The victim began asking defendant about a woman with whom she had seen defendant. Defendant saw the victim pulling a syringe from her arm. He told the victim to put on her clothes and that he was going to take her home. The victim accused defendant of wanting to go to the other woman. Defendant denied the accusation and proceeded to put on his clothes. Defendant was putting on one of his boots while the victim was standing over him with his other boot. At that point, she swung the *459 boot at him. She hit defendant over his eyelid with the boot and told him she was going to cut him and kill him. Defendant told the victim to stop. The victim again came toward defendant with the boot. Defendant pushed her. She lost her balance and hit her head hard on an air conditioner vent. The victim stood up, picked up a gin bottle and threw it at defendant. Defendant ducked, and the bottle struck the wall and broke. The victim repeated that she was going to kill defendant. Defendant asked her to please stop. At that point, the victim felt around the floor and came up with the "razor blade, box cutter." Defendant grabbed the victim's hand while she tried to kick him in the groin. Defendant struck her twice in her face with his fist. The victim fell to her knees and dropped the razor. Defendant picked up the razor. The victim got up again, picked up the boot and again told defendant she was going to kill him. She advanced on defendant swinging the boot at defendant. Defendant still had the razor and moved it from left to right not knowing if he had cut her. The victim fell to her knees. She kept coming toward defendant, trying to bite, scratch and kick him. After the victim hit defendant in the groin, defendant kicked her. The victim fell again but got back up. Defendant kicked her again, and this time she stayed down. Defendant told the victim they should stop and to let him take her home. Using profanity, the victim told defendant she hated him and to get away from her. She was still trying to throw things at defendant. Defendant picked up the box cutter and syringe, walked out, and threw them in a dumpster.
From the apartment building, defendant went to see a friend at the Admiral Motel. The friend was not home. However, defendant went into a utility room at the motel and slept. When he awakened, he began walking toward his grandmother's home. Along the way, defendant came to the apartment building where he and the victim had been. Defendant had no idea the victim might still be there. He heard someone call out his name. He called out the victim's name, asking if it was she. Defendant went inside the building and saw the victim lying on the floor. She asked him to hold her and pleaded with him not to leave her. Defendant told her he was going to get help and would return shortly. He then went to the nursing home and asked a man to call emergency 911. Defendant went back to the apartment building, gave the victim some water, placed some carpet foam under her head and covered her to keep mosquitos from biting her. Defendant then went outside to wait for help to arrive.
Defendant denied that he hit the victim with a piece of pipe or that he shaved her head. According to defendant, only when he kicked the victim in the side did she become helpless. They had consensual sexual relations at the apartment building; and, when he left the apartment building, he perceived her as being "all right," not knowing the extent of her injuries. Additionally, he had no intention of killing the victim.

ASSIGNMENTS OF ERROR NUMBERS TWO, FIVE AND SIX
In assignment of error number two, defendant contends that the trial court erred in sustaining the state's objection to defense counsel's cross-examination of the victim concerning her alleged history of domestic violence. In assignment of error number five, defendant claims that the trial court erred in sustaining the state's objection to defense counsel's questioning of defendant on redirect examination concerning his knowledge of alleged fights between the victim and her family. In assignment of error number six, defendant contends that the trial court erred in sustaining the state's objection to the presentation of testimony of defense witness Acqueline Burnette concerning whether or not the victim had injured Burnette in 1987.
During the victim's direct examination, she gave the following testimony. In January of 1992, she and defendant began a romantic relationship. They began living together during the following month. They lived together until the victim left defendant and began living with her "auntee" in August, 1992, approximately three weeks before the instant offense. The victim stated that the reason she left defendant was because they *460 were constantly fighting, with him abusing her.
Thereafter, on cross-examination, the victim testified as follows. In February or March of 1992, she and defendant "got into it;" and she cut defendant with a razor blade. In approximately May of 1992, while she and defendant were living at the Universal Motel, they "got into it," she cut him and he gave her a black eye. During this incident, the victim had to be taken to a hospital on a stretcher. She indicated that on this occasion she was only protecting herself. Later, during the time the victim and defendant were living with his aunt, she and defendant again "got into it." On this occasion, the victim threw something at defendant and she assumed that it hit him.
The victim further testified that she had lived with her mother in the past. At that point in cross-examination of the victim, defense counsel posed the question which prompted the court's ruling forming the basis for assignment of error number two. The question was whether the victim had ever "attack[ed]" her mother at any time while she was living with her mother. The state objected to the question. Outside the presence of the jury, the state essentially contended that under LSA-C.E. art. 404, evidence of the victim's character was limited to incidents between the victim and defendant and that any incident between the victim and her mother accordingly was irrelevant and inadmissible. Defense counsel argued a contrary view. In sustaining the state's objection, the court indicated that, while defense counsel's questioning concerning the alleged incidents between defendant and the victim was permissible, his questioning in regard to the alleged incident between the victim and her mother was impermissible under LSA-C.E. art. 404 and would not be allowed.
During his testimony on direct examination, defendant stated that he and the victim began a sexual relationship in December of 1991 and that she moved in with him in January or February of the following year. He stated that the victim had a drug habit and indicated that when she is under the influence of drugs, she becomes violent. He stated they had engaged in "fights." On one occasion, the victim cut him on his chest with a razor blade. On another occasion, she stabbed him in the shoulder with a knife. In July of 1992, while he and the victim were living with defendant's aunt, Elizabeth Odom Chapman, the victim hit him in the head with a vase. According to defendant, he stayed with the victim because she is a very loving and understanding person when she is not taking drugs and he thought he could help her with her drug problem. Consistent with his version of the facts, defendant emphatically stated that the victim attacked him and that all he did was defend himself.
After the state's cross-examination of defendant, defense counsel asked defendant during redirect examination if the victim had ever told him about any "altercations she had had with family members." The prosecutor objected to the question on two grounds, one of which was that the question sought to elicit testimony that exceeded the proper scope of redirect examination.[1] The trial court sustained the state's objection on the basis that the question was beyond the scope of matters covered on cross-examination, which ruling formed the basis of assignment of error number five.
Later, defendant called Acqueline Burnette, the victim's sister, as a defense witness. During her direct examination, defense counsel asked Burnette whether or not she had been "injured by" the victim in 1987. The state objected to the question on the ground that defendant had not presented any evidence of his personal knowledge of any instance of violence between the victim and her sister and that, accordingly, the testimony sought to be elicited by the question was irrelevant. The trial court sustained the objection, indicating that had defendant presented some evidence during his direct examination that he knew of some alleged violence by the victim against someone other than defendant, the court's ruling might be different. This ruling served as the basis for assignment of error number six.
*461 Subject to specified exceptions, Louisiana Code of Evidence article 404 A. generally disallows admission of evidence of a person's character or a trait of his character for the purpose of proving he acted in conformity therewith on a particular occasion. One of these exceptions is set forth in LSA-C.E. art. 404 A. (2), which provides:
(2) Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible; or
(b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;[2]
Additionally, LSA-C.E. art. 404 B. (2), entitled "Other crimes, wrongs, or acts[,]" provides as follows:
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.[3]
*462 On appeal, defendant asserts that, because he pled self-defense and there was evidence of a familial relationship and a history of assaultive behavior between the defendant and the victim, the trial court erred by construing LSA-C.E. art. 404 as limited to specific instances of conduct and domestic violence between the victim and the accused and, thus, in precluding him from introducing evidence of specific instances of conduct and domestic violence between the victim and her mother and between the victim and her sister. Defendant argues that the trial court unfairly restricted his redirect examination by not allowing him to testify as to whether or not the victim had ever told him that she had had any fights with members of her family. Defendant submits that, because he claimed self-defense, his state of mind was relevant and that he should have been allowed to show that he feared the victim because of his knowledge of her prior acts of violence against other individuals. Defendant claims that the ruling precluding the introduction of such evidence denied defendant his constitutional rights to present a defense and to a fair trial.
In this case, defendant claimed self-defense. Both he and the victim gave testimony reflecting that they had lived in a familial relationship shortly before the instant incident and that there was a history of assaultive behavior between the victim and defendant, as revealed by the testimony of the victim and defendant summarized above. We find that, once this foundation was established, evidence of the victim's dangerous character would have been admissible for two purposes: (1) to show defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine whether or not the victim was the aggressor in the instant conflict. See State v. Ducre, 596 So.2d 1372, 1379 (La.App. 1st Cir.), writ denied, 600 So.2d 637 (La.1992). The pertinent provisions of LSA-C.E. art. 404 quoted above, under appropriate circumstances, authorize the admission of evidence of the victim's dangerous character which includes specific instances of conduct and domestic violence by the victim whether against the accused or others. Cf. State v. Lee, 331 So.2d 455, 461 (La.1975). However, in order for evidence to be admissible to show the defendant's reasonable apprehension of danger, it must be shown that the defendant knew of the victim's prior acts of violence or reputation for violence. On the other hand, if the evidence is to be introduced to help determine who was the aggressor in the conflict, there is no requirement that the defendant have knowledge of the victim's prior acts or reputation. However, only evidence of general reputation, not evidence of specific acts or personal opinion, is admissible to establish who was the aggressor. State v. Edwards, 420 So.2d 663, 671 (La.1982); State v. Johnson, 553 So.2d 865, 871 (La.App. 1st Cir.1989), writ denied, 558 So.2d 600 (La. 1990).
Consequently, the trial court erred by construing the pertinent provisions of LSA-C.E. art. 404 as being limited to evidence of specific instances of conduct and domestic violence by the victim against defendant. However, because defense counsel's question to defendant on redirect examination as to whether or not "[the victim] had ever told [him] about any altercations she had had with family members" was beyond the subject matter covered on cross-examination, it was within the court's discretion to refuse to allow defendant to bring out such new matter on redirect. See LSA-C.E. art. 611 D.
Moreover, notwithstanding the trial court's erroneous interpretation of LSA-C.E. art. 404, defense counsel never preserved or attempted to preserve the testimony which he now argues was improperly excluded, by making a proffer or attempting to proffer the evidence as required by LSA-C.E. art. 103 A. (2).[4]See State v. Dixon, 620 So.2d *463 904, 909 (La.App. 1st Cir.1993). With the record in this posture, it does not reveal the nature of, or even whether or not there actually were, any alleged specific instances of conduct and domestic violence by the victim against persons other than defendant; and, if there were any such instances of conduct and domestic violence by the victim against others, whether or not defendant knew of any such instances. Hence, although we find that the court erroneously interpreted LSA-C.E. art. 404, absent a proffer of evidence, we are unable to determine if the excluded testimony was admissible or how probative it might have been. Thus, even if the excluded evidence was admissible, we cannot determine whether or not a substantial right of defendant was affected by the exclusion of this undisclosed testimony. See State v. Gantt, 616 So.2d 1300, 1308 (La.App. 2nd Cir.), writ denied, 623 So.2d 1302 (La.1993).
These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
By means of this assignment, defendant contends that the trial court erred in sustaining the state's objection to defense counsel's cross-examination of Mathis Holiday, by which counsel sought to elicit testimony concerning the victim's reputation for untruthfulness. He asserts that this ruling unfairly restricted his right to attack the credibility of the victim and to present a defense. He submits that the trial court erred by concluding that the requisite foundation under LSA-C.E. art. 608 had not been met.
LSA-C.E. art. 608 provides as follows:
A. Reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness.
(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
(3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 or 609.1 or as constitutionally required.
C. Cross-examination of character witnesses. A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.
On cross-examination, state witness Mathis Holiday testified that he had lived in Baton Rouge for almost sixteen years, knew the victim well and had heard people in the community talk about her. When defense counsel asked Holiday what kind of reputation the victim had based on the conversations he had heard, the prosecutor objected to the question. Outside the presence of the jury, the prosecutor stated that the defense had not established the foundation required by LSA-C.E. art. 608 to attack the victim's credibility. At that point, defense counsel was allowed to question Holiday (out of the jury's presence) during which the following exchange occurred:

*464 By Mr. Mitchell:
Q. Mr. Holiday, how long have you lived in the community where you live now?
A. About four years and some months.
Q. Have you lived in the same community with [the victim]?
A. I was staying [sic] when she was staying with [defendant's] aunt, and I stayed around Zion City and Rosenwald.
Q. Have you spoken with people in either of those communities who talked about [the victim's] reputation for truth?
A. A few.
Q. What do you call a few?
A. About maybe three or four.
Q. And the people that you've talked to who talked about her reputation did they express their knowledge of her, that they know her?
A. Yeah.
Q. Did they express opinions as to her truthfulness?
A. Yes.
Q. Are these people related to you or to the defendant?
A. They're not related to him, and not related to me.
Q. And what is that reputation in the community?
A. Okay. When they first saw her come into Brookstown and saw him and her be [sic] walking the streets sometimes
Q. Mr. Holiday, my question is, what is the community's opinion of [the victim's] truthfulness or untruthfulness?
A. Well, they said she wasn't so.
By the court:
Q. Wasn't what?
A. Wasn't what youexplain what you're saying.
By Mr. Mitchell:
Q. Is she truthful or is she not? Does she have a reputation for being truthful or does she have a reputation for being untruthful?
A. Well, they said she had a bad reputation, okay? I'll put it like that.
Q. Does she have a reputation for lying or telling the truth?
A. Well, they say for lying. And they say for fooling with other things. Like I said, you know.
Mr. Mitchell:
Your honor, I intend to limit it to her truthfulness.
The court:
Well, you can limit it to that. He's talked to three or four people. If you talk to the right three or four people they might call me a lying S.O.B., or whatever. I don't know. I don't think that represents a community. It depends on which three or four you get.
Mr. Mitchell:
Your honor, I believe the jurisprudence is that the witness is credible, the persons that he's talked to is credible. There is no set number of persons that he has to talk to.
The court:
That isn't what the code says.
Mr. Mitchell:
The code also doesn't give a number.
The court:
No, it doesn't give a number, but I know that a communityI think I can almost take judicial notice of the fact that Brookstown is a community that is significantly greater than three or four people. If he told me three or four dozen or three or four hundred even, maybe you might have something, but not three or four people. Like I said, if you get the right three or four people you can hear anything you want to hear. Objection of the state is sustained....
Character testimony is the opinion by a member of the community exposed over an extended period of time to hearing the discussion by other members of the community shared by himself and the person whose reputation is at issue. Before being permitted to testify, the reputation witness must be shown to be qualified to testify on the subject as a member of the community in a position to speak with authority on the subject. State v. Deaton, 412 So.2d 586, 589 (La.1982). Proof of general reputation attacking or supporting credibility may be made not only of the reputation of the person where he lives, *465 but also of his repute, as long as it is general and established, in any substantial community of people among whom he is well known, such as the group with whom he works, does business or goes to school. State v. Clark, 402 So.2d 684, 687 (La.1981).
Citing State v. Taylor, 621 So.2d 141, 153 (La.App. 2nd Cir.1993), writ denied, 93-2054 (La. 2/11/94), 634 So.2d 371, defendant asserts that the trial court erred by ruling that he failed to establish the required foundation for Holiday's testimony as to the victim's reputation for untruthfulness. We disagree.
In Taylor, the reputation witness had learned of the defendant's reputation through discussions with his family members, their pastor, students at school and Haynesville Mayor Tom Crocker. In finding the foundation adequate for the witness' reputation evidence, the Taylor court indicated that without this identification of the persons with whom the reputation witness had held discussions, the foundation issue might have given the court cause for concern. We find the instant situation distinguishable from that in Taylor but analogous to the situation presented in another case decided by the Second Circuit Court of Appeal, State v. Jenkins, 456 So.2d 174, 177-178 (La.App. 2nd Cir.), writ denied, 460 So.2d 1043 (La.1984). The court in Jenkins upheld the trial court's ruling sustaining the state's objection to the adequacy of the foundation for reputation evidence. In reaching its decision, the court noted:
At best, the testimony of this witness was to the effect that he had known the victim, had frequented bars himself, had seen the victim at bars, and had heard "some" or a "few" unidentified people talk about her reputation without specificity as to whom he had heard talking, how many times he had heard them discussing the victim, over what length of time he had heard these conversations, and how well the people who had discussed her were known to either the victim or this witness. Clearly, this was an insufficient foundation to determine that this evidence of repute was based on reputation of the victim among those who knew her well.
Jenkins, 456 So.2d at 178.
In the instant case, Holiday testified that he lived in the community, knew the victim and had spoken with a few (three or four) unidentified people in the community about the victim's reputation for truthfulness. Although Holiday stated that the persons to whom he had spoken were not related to him or the defendant, there was no specificity setting forth with whom Holiday had spoken, how many times or when the discussions had occurred, or how well these people were known to either the victim or Holiday. Clearly, the trial court did not err in ruling that an insufficient foundation had been laid to admit the testimony of this character witness.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TEN
In this assignment of error, defendant contends that the trial court erred by imposing an excessive sentence and failing to consider the sentencing guidelines of LSA-C.Cr.P. art. 894.1. Defendant asserts that the trial court failed to justify the maximum sentence for the instant offense, his first felony conviction. Specifically, defendant claims that the court gave no consideration to the likelihood that he would commit another crime, or his potential for rehabilitation; and the court made no mention of his family background, employment history, education level, physical health, or emotional stability.
A trial court is required to "consider" the Felony Sentencing Guidelines in imposing sentence and to state for the record the considerations taken into account and the factual basis for the sentence imposed. LSA-C.Cr.P. art. 894.1 A. and C. Provided the court complies with these requirements of article 894.1, it has "complete discretion to reject the Guidelines and impose any sentence which is not constitutionally excessive, but is within the statutory sentencing range for the crime of which a defendant has been convicted...." State v. Smith, 93-0402, p. 3 (La. 7/5/94), 639 So.2d 237, 240 (on rehearing) *466 (footnote omitted). See also LSA-R.S. 15:326 A., LSA-R.S. 15:328 B., LSA-C.Cr.P. art. 881.4 D., LSA-C.Cr.P. art. 881.6 and LSA-C.Cr.P. art. 894.1 A. The Louisiana Supreme Court has described our duty as a reviewing court as follows:
[W]here the trial judge has considered the Guidelines and imposed a sentence, adequately stating for the record the considerations taken into account and the factual basis for imposition of that sentence, an appellate court is limited to a review of the sentence imposed for constitutional excessiveness, without regard as to whether the trial judge either employed or deviated from the Guidelines.
Smith, 93-0402 at 3, 639 So.2d at 240.
Defendant filed a motion to reconsider sentence, which was denied. In articulating its reasons at the sentencing hearing, the trial court included a remark that it had been "wrestling with what sentence to impose for quite awhile." Notwithstanding the state's assertion that this remark reflects that the court considered the Felony Sentencing Guidelines, our review of the record fails to disclose that the court ever even mentioned the Felony Sentencing Guidelines at sentencing. We disagree with the state that the referenced remark reflects consideration of the Guidelines. We conclude that there is nothing in the record to show that the trial court actually considered the Guidelines in imposing sentence. Therefore, we are compelled to vacate defendant's sentence and remand this case for resentencing in order for the court to consider the guidelines as required by Smith.
Furthermore, upon resentencing defendant, the trial court must include a provision granting defendant credit for time served.[5]
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.
NOTES
[1] The other ground for objection was the same as that which previously had been sustained and formed the basis for assignment of error number two.
[2] Comment (e) to LSA-C.E. art. 404 states, in pertinent part, as follows:

(e) Subparagraph (A)(2) generally follows Federal Rule of Evidence 404 relative to the admissibility of evidence as to the character of the victim. The provision relative to hostile demonstration or overt act on the part of the victim was added by Senate Committee amendment in order generally to continue prior Louisiana law in this regard. See former R.S. 15:482. The provisions relative to admissibility of designated evidence in cases involving claims of self-defense in specified contexts (likewise added by Senate Committee amendment) were designed to limit the scope of the hostile demonstration or overt act requirement in the specified context, and specifically authorizes the reception of expert testimony in this context. Like its counterpart in the Federal Rules of Evidence, Subparagraph (A)(2) deals only with evidence of the victim's character offered as tending to prove that the victim acted or did not act in a particular way on the occasion in question (in the most usual context, as bearing on whether the victim was the first aggressor). It thus does not address a related but very different evidentiary problem, that is, the circumstances under which an accused claiming self-defense may adduce evidence bearing upon his state of mind as to what he might reasonably have anticipated that the victim would do. Thus, the Article does not deal with such questions as the admissibility of evidence that the accused had heard that the victim had made certain threats or done certain acts that caused the defendant to fear harm. That these two matters are separate problems controlled by different rules has been well recognized in the Louisiana decisions and elsewhere. (citations omitted)
[3] Comment (n) to LSA-C.E. art. 404 states, in pertinent part, as follows:

(n) The provision in Paragraph B relative to hostile demonstration or overt act on the part of the victim was added by Senate Committee amendment in order generally to continue prior Louisiana law in this regard. See former R.S. 15:482. The provisions relative to admissibility of designated evidence in cases involving claims of self-defense in specified contexts (likewise added by Senate Committee amendment) were designed to limit the scope of the hostile demonstration or overt act requirement in the specified context, and specifically authorizes the reception of expert testimony in this context.
[4] LSA-C.E. art. 103 A. (2) provides as follows:

A. Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
* * * * * *
(2) Ruling excluding evidence. When the ruling is one excluding evidence, the substance of the evidence was made known to the court by counsel.
[5] In reviewing the record for patent error, we found that, although the minutes indicate the court credited defendant with time served, the transcript fails to show the court gave defendant credit for time served. The failure to credit defendant with time served is error patent. See LSA-C.Cr.P. art. 880; State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990).