<hr/>

(96 South. 813)

No. 25823.

**STATE v. CORNEILLE et al.**

(April 30, 1923. Rehearing Denied June 4, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Criminal law** ⊜⇒364(2)—**Statement of accused held admissible.**

Where accused's codefendant, in provoking difficulty in which deceased was killed, asked whether he made a certain remark shortly before, testimony that after such remark was made the codefendant was heard to tell accused that he could not "handle this fellow," and that accused said there was always a way "to get him to your size," was admissible, though witness did not hear all the conversation; the portion heard being sufficiently complete, and the jury the judges of its effect.

2. **Criminal law** ⊜⇒1111(5)—**Bill of exceptions held without basis when trial judge says there was no such bill, and note of evidence shows occurrence took place in jury's absence.**

When note of evidence attached to bill of exceptions complaining of judge's alleged comment on the evidence shows it took place in the jury's absence, and trial judge says there was "no such bill," the bill is without basis.

3. **Witnesses** ⊜⇒323—**Improper for counsel to claim surprise by testimony when· he knows such position is not correct.**

If witness had previously informed state's counsel as to what his testimony would be, it was highly improper and unfair to court, accused, and the witness·for counsel to assume the position that he was surprised, knowing it was not correct. .

4. **Witnesses** ⊜⇒323—**Error to permit impeachment of witness after counsel in jury's absence had abandoned the attempt.**

Where state's counsel, after examining, in jury's absence, witness by whose testimony he claimed to be surprised, abandoned his purpose to impeach the witness, he should not have been permitted, without renewing his request for permission to lay foundation for impeachment, to examine the witness about testimony on coroner's inquest claimed to be at variance with that on the trial.

5. **Witnesses** ⊜⇒323—**One entrapped by hostile witness may contradict or impeach him.**

One who, without warning, has been entrapped by'a hostile witness may not only contradict his testimony, but destroy it by impeachment.

6. **Witnesses** ⊜⇒323—**Counsel knowing what testimony will be has no right to ask impeaching questions when not intending to impeach.**

When counsel places witness on the stand knowing what he will swear, he has no right to pursue method of examination the only object of which is to impeach, when he does not intend to impeach him.

7. **Criminal law** ⊜⇒1170½(1)—**Impeachment by state of its own witness held favorable to defendant.**

Where witness who testified he saw deceased's brother pick up a pistol after deceased fell also testified' that he had told· state's counsel of the matter before going on the stand, and did not so testify before the coroner because he was not asked, the improper attempt to impeach him was favorable. and not prejudicial to accused.

8. **Homicide** ⊜⇒113—**One provoking difficulty has no right of self-defense without retreating and abandoning difficulty, though person attacked draws deadly weapon.**

One provoking difficulty forfeits his right of self-defense, unless in good faith he with-

draws or retreats, and makes known to his adversary his desire to be at peace, though he attacks his adversary with his fists, and the adversary draws deadly weapon.

**9. Homicide ⬤=51—Shooting in good faith after person attacked has drawn weapon to meet attack with fists held only manslaughter.**

If one attacking another with his fists, and only shooting him after the other has drawn a deadly weapon, is able to convince the jury of his good faith, the homicide is reduced to manslaughter.·

**10. Homicide ⬤=113—One shooting in defense of another who provoked difficulty subject to same rules applicable to person defended.**

When difficulty was provoked by accused's codefendant, in whose defense he claims to have killed deceased, his rights as respects necessity of retreat to revive right of self-defense are governed by same principles as apply to his codefendant.

**11. Homicide ⬤=340(1) — Instruction as to meaning of peace of the state held harmless, though inaccurate.**

Charge that murder was the unlawful and felonious killing of a human being in the peace of the state, and stating that this meant when the country was not at war, and the person killed not an alien enemy, though inaccurate, *held* harmless.

**12. Homicide ⬤=7—"In the peace of the state" as applied to deceased, defined.**

In definition of murder as unlawful and felonious killing of human being "in the peace of the state," the quoted phrase means the same as "in the king's peace" under the English common law, and negatives the idea that deceased was actually engaged in waging war against the state.

**13. Criminal law ⬤=1178—Bill of exceptions not mentioned in brief or oral argument deemed abandoned.**

Bill of exceptions not ·mentioned in the oral argument or referred to in the· brief will be regarded as abandoned.

**14. Homicide ⬤=307(1)—Instruction to find verdict for manslaughter if satisfied beyond reasonable doubt that defendant was guilty thereof, but not so satisfied as to murder, not erroneous.**

Instruction that, if jury were not satisfied beyond a reasonable doubt that accused was guilty of murder, but were convinced beyond such reasonable doubt that he was guilty of manslaughter, the verdict should be guilty of manslaughter, was not objectionable.

**15. Homicide ⬤=286(2)—Instruction as to inference of malice from wounding with deadly weapon held not erroneous.**

Instruction that malice was inferred when ·responsible person, without authority, and under circumstances indicating deliberation, and without apparent provocation or necessity, wounded another in a vital part with a deadly weapon, was not erroneous.

**16. Homicide ⬤=300(3)—Instruction that self-defense cannot be set up if conflict premeditated· held not error.**

Instruction that, if a ·conflict was in any way premeditated by defendant, self-defense could not be set up, was not erroneous.·

**17. Homicide ⬤=300(3) — Instruction as to rights· of one aiding, abetting, and assisting another who has forfeited his right of self-defense held not error.** ·

Instruction that, if party who originated or provoked difficulty forfeited his right of self-defense, no person present aiding, abetting, and assisting him with full knowledge of the facts could plead self-defense, was not erroneous.

**18. Criminal law ⬤=945(1) — Question is whether newly discovered evidence would produce different result.**

The paramount test of importance of newly discovered evidence is whether it would be likely to produce a different result on another trial.

**19. Criminal law ⬤=961—Importance of newly discovered evidence primarily for trial court subject to review.**

The importance, of newly discovered evidence is primarily to be determined by the trial judge subject to review by the Supreme Court.

**20. Criminal law ⬤=961—Assumed in passing on newly discovered evidence that second jury ⸱ would follow the charge.**

In determining whether newly discovered evidence would be likely to produce different result on another trial, it must be assumed that the second jury 'would follow the law as given in the charge.

**21. Criminal law ⬤=945(1)—Newly discovered evidence that deceased had pistol not ground for new trial when defendant's companion provoked difficulty.**

Where it was undisputed that one in whose defense defendant claimed to have shot deceased provoked the difficulty by attacking de-

ceased with his fists, defendant being present and having full knowledge of the circumstances and defendant' was convicted only of manslaughter, newly discovered evidence that deceased had a pistol could not legally change the result.

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; Robert S. Ellis, Judge.

Louis Corneille and another were indicted for murder, and the defendant named was convicted of manslaughter, and appeals. Affirmed.

Reid & Reid and Wm. H. McClendon, Sr., all of Amite (Chandler C. Luzenberg, of New Orleans, of counsel), for appellant.

A. V. Coco, Atty. Gen., T. S. Walmsley, Asst. Atty. Gen., and M. J. Allen, Dist. Atty., of Amite (J. H. Inman, of Ponchatoula, of counsel), for the State.

DAWKINS, J. Louis Corneille and John Gainey were charged with the crime of murder; Gainey was acquitted, but Corneille was convicted of manslaughter, and prosecutes this appeal upon eight bills of exception to the rulings of the lower court.

### Bill No. 1.

[1] The first bill was to the permitting of a state's witness, over objection of defendant's counsel, to repeat part of a conversation between the two accused which took place a few moments before the shooting. This witness' testimony on the point was as follows:

"Q. State what, if anything, they had to say to each other? (Objection and ruling.)

"A. Mr. Corneille and Mr. Gainey were standing on the road and Gilbert Demingas and one more boy. I am not sure just who he was. They was having a little talk between themselves, and Mr. Gainey says to Mr. Corneille, 'I can't handle this fellow,' and he said, 'Well, there is always a way to get him to your side (size).' By that time I went on to the dance hall and went to dancing.

"Q. Is that all you heard?

"A. Yes, sir; I went on to the dance hall.

"Q. And how long after that was it that you saw either Corneille or Gainey, or both of them? How long after that was it before you saw them again?

"A. I had went in there to dance. I had danced one dance and started on another.

"Q. What happened then?

"A. Mr. Gainey come in there and called Pete (the deceased) out, and I saw them going out, and walked on to the door with them; and Gainey asked Mr. Rosa, 'Did you say that?' and he said 'Yes.' By that time he struck him.

"Q. Who struck?

"A. Mr. Gainey struck Pete Rosa. Mr. Rosa just stook (stood) there, and Gainey struck him again, and when Gainey started to hit him the third time Mr. Rosa hit him.

"Q. What were they striking with?

"A. Fists; just their fists. By that time Mr. Rosa struck him. He never did get to hit Mr. Rosa again. When Mr. Gainey saw he was getting whipped, he said, 'Hand me my gun.' By that time the shooting took place.

"Q. How many shots?

"A. Between three and five shots. Not less than three and not more than five.

"Q. Where did the shots come from?

"A. Come from?

"Q. Yes.

"A. Well it come from Mr. Corneille.

"Q. When the first shot was fired, what was Pete Rosa doing?

"A. Standing up.

"Q. What was he doing with his hands?

"A. He was just standing up like any man would be standing."

The record otherwise discloses that a short while before the happening of the events detailed in the testimony quoted above, a disturbance had taken place just outside the dance hall, and deceased, who was floor manager, had gone to the door and remarked to those outside that if they did not stop he was going to "start a cemetery." It was, presumably, this remark which Gainey had reference to when he asked deceased, "Did you say that?" and, upon receiving an affirmative reply, according to the testimony, started the difficulty. The state's contention was that Gainey and Corneille were speaking about Rosa (deceased) when the first said, "I can't handle this fellow," and the other

replied, "Well, there is always a way to get him to your size," and that this evidence was permissible to show motive and intent in the light of what subsequently happened.

Of course, the objection was that the witness could not detail all of the conversation; but the portion which was heard was sufficiently complete within itself to permit it to go to the jury, who were to be the judges of its effect. State v. Vallery, 47 La. Ann. 182, 16 South. 745, 49 Am. St. Rep. 363; State v. Spillers, 105 La. 163, 29 South. 480.

### Bill No. 2.

[2] A certain state's witness was on the stand, and, being asked what he saw at the time of the shooting, stated, in addition to having seen one of the accused shoot the deceased, that he saw the latter's brother pick up a pistol from behind deceased after he fell. Whereupon counsel for the state pleaded surprise and asked permission to lay the foundation for impeachment, which was objected to, and the court, in ruling upon the matter, stated that the witness had "volunteered" the information about the picking up of the pistol. Defendant's counsel contend that this was a commenting upon the evidence in the presence of the jury, but the trial judge says there was "no such bill," and the note of evidence attached thereto shows that the ruling complained of was made while the jury was out of the courtroom.

There is, therefore, no basis for the bill.

### Bill No. 3.

One Kinchen was called as a state's witness (being the one referred to in connection with bill No. 2), and, being asked to state what he saw at the time of the homicide, responded as above stated, and added that he had seen Hughie Rosa, brother of deceased, pick up a pistol from behind the latter after he had fallen. Counsel for the state pleading surprise, the jury was withdrawn, and an effort was made to lay the foundation for impeachment; but, after considerable direct and cross examination, counsel announced that he would abandon said purpose. The jury was then brought back, and, notwithstanding the declaration that he had withdrawn or abandoned the purpose to impeach, counsel proceeded to ask the witness:

"Q. Did you state at the coroner's inquest—
"Mr. Reid: Don't answer that until I object to it.
"Mr. Inman:—anything about seeing a man pick up a pistol behind Mr. Rosa?"

[3-6] Objection was made that such examination was only permissible to lay the foundation for impeachment, and that that purpose had been expressly abandoned. The objection was overruled, and the court allowed the witness to be questioned at length about the matter, and as to his reason for not giving this information to the coroner's jury. The witness said he had not been asked about any one picking up a pistol, but if one was found upon the deceased when his body was searched. He further stated that he had told the very counsel about it who was interrogating him, and who had pleaded surprise, before being placed upon the stand. No attempt was made to refute this latter statement that he had previously informed counsel as to what his testimony would be, and, if true, it was certainly highly improper and unfair to the court and accused, as well as the witness, to assume such a position, if counsel knew it was not correct. We also think that the lower court should not have permitted the course pursued by counsel, but should have sustained the objection, after what had taken place out of the presence of the jury, unless counsel had renewed his request to be permitted to lay the foundation for impeachment. State v. Stephens, 116 La. 39, 40 South. 523; State v. Felix Robinson, 52 La. Ann. 626, 27 South. 124. The rule undoubtedly is that one who, without warning, has been entrapped by a hostile witness may

not only contradict his testimony, but may destroy it by impeachment. But, where, as in this case, counsel places the witness on the stand, knowing what he will swear to, he has no right to pursue a method of examination, the only object of which could be to impeach, when in fact he does not intend to do so.

[7] However, it is not every error of the trial court of this nature that justifies us in setting aside a conviction, but only such as may or is reasonably calculated to prejudice the accused before the jury. Like the court below, we think that, when the witness gave as his reason for not telling the coroner's jury of seeing the pistol picked up that he was not asked about it, and that he had informed counsel for the state of the matter before going on the stand, no effort being made to contradict that statement, the result was really favorable to accused, instead of prejudicial. Hence we are not justified in disturbing the verdict on this ground.

### Bill No. 4.

[8, 9] The lower court, at the request of defendant's counsel, gave the following special charge, to wit:

"It is the general rule that, where proof shows that defendant began the attack upon the occasion of the killing, it follows that he thereby forfeited his right of self-defense. There is an exception to this rule where the accused begins the attack and meets with a counter-attack of disproportionate violence; as where one attacks with his fists, no great disparity in size or physical strength being proven, meets with a counter attack with a deadly weapon. Upon such circumstances, the right of self-defense is revived in the original assailant, and he may use all means necessary to the preservation of his life against such violent counter attack. * * * *"

But over the objection of counsel for accused the court added:

"Provided he first make or signify an honest endeavor to retire from the conflict."

Succinctly stated, it is argued by defendant's counsel that, where A. provokes a difficulty, with the purpose which is clearly apparent to his adversary, B., of engaging in a fist fight only, there being no great disparity of physical strength, and B. draws a deadly weapon, A may kill in self-defense, notwithstanding he provoked the conflict, and without the necessity of withdrawing and making known to B. his purpose to desist.

Of course, the law, under our system of government, looks upon the life of one citizen as equally valuable with another. The object of punishing homicide is, first, for the protection of the individual, and, secondly, in the interest of the state or society as a whole. Hence such an act is never justified except it be to protect the life of a particular person or, as in case of legal execution, the entire people. Therefore, in according to a private person the right to do, in a proper emergency, for himself that which the sovereign may do deliberately in the interest of all, it is upon the condition and theory that this course has been made necessary without fault of his own; that under circumstances over which he had no control he has been compelled to kill in self-defense. The difficulty and danger of trying to differentiate between a case where an assailant enters the conflict with the intention of using only the weapons which nature has given him, and where the purpose is to use more deadly means, is apparent. It would be hard to believe that one had provoked such a difficulty in good faith, when he was armed with a deadly weapon; yet it would hardly be possible for him to be "quicker on the draw" than his adversary when the necessity had arisen, unless beforehand he had provided himself with such a weapon. In other words, counsel has suggested a case which, from a practical standpoint, would be about as near impossible as could be conceived. From these

considerations we can see the wisdom of the law in declaring that he who provokes a difficulty shall forfeit the right of self-defense, unless, in good faith, he withdraw or retreat, and make known to his adversary the desire to be at peace. He is not wholly robbed of relief under the circumstances suggested by counsel, where he is able to convince the jury of his good faith, for the result would be in law to reduce the homicide from murder to manslaughter; yet he could not be excused altogether in the eye of the law, as where, without fault, he had acted in defense of his own life.

"If the defendant in any way challenged the fight, and went to it armed he cannot afterward maintain that in taking his assailant's life he acted in self-defense. * * * But where the defendant, without an intent to take the decedent's life, provoked the quarrel, this, while it destroys the excuse of self-defense, does not, if the deceased's attack put the defendant's life in danger, militate against reducing the offense to manslaughter." 1 Wharton's Crim. Law· (11th Ed.) p. 773 et seq. § 613, and cases in footnotes.

"But though the defendant may have thus provoked the conflict, yet, if he withdraws from it in good faith, and clearly announces his desire for peace, then if he be pursued his rights of self-defense revive. Of course, there must be a bona fide surrender and withdrawal on his part; for, if there be not, then he will still continue to be regarded as the aggressor. But if A. really and evidently withdraws from the contest, and resorts to a place of security, and B., his antagonist, knowing that he is no longer in danger from A., nevertheless attacks A., then A.'s rights in self-defense revive." Id. § 614.

In other words, the issue which counsel propounds (but which the trial judge says was not supported by the evidence) falls within the rule of imperfect, as distinguished from perfect, self-defense. ·

"The right of self-defense, as we have seen, is divided into two general classes, perfect and imperfect. A perfect right of self-defense can only obtain where the party pleading it acts from necessity, and is wholly free from wrong or blame in occasioning and producing the necessity, which requires his action. But if he is in the wrong and is himself violating, or in the act of violating, the law, and on account of his own wrong has placed himself in a situation that it becomes necessary for him to defend himself against an attack which is superinduced or created by his own wrong, the law limits his right of self-defense, and regulates it according to the magnitude of his wrong, and his right of self-defense is an imperfect one. And whenever one, by his own wrongful act, produces a condition of things wherein it is necessary for his own safety that he shall take life or do serious bodily harm, then the law imputes to him his own wrong and its consequences, to the extent of considering them in determining the degree of the offense, which, but for such acts, would never have been occasioned. And in a case of this class the court should apply the law to the facts, and inform the jury as to what grade of offense the accused would be guilty of in the supposed case.

"The application of these rules, therefore give rise to the rule that, if the act of aggression was a wrongful act, whether illegal or not, and was done with intent to provoke a difficulty with a view of taking life, the right of self-defense is forfeited and the killing is murder, though done to save the slayer's life; and if the act was wrongful and in violation of law, and reasonably calculated to produce the occasion, then the right of self-defense is abridged, and not lost, and the offense is manslaughter; and if the act, though wrongful, was not illegal, and was not intended to provoke a difficulty, nor reasonably calculated to produce occasion and necessity for taking life, and the aggressor kill to save himself, his right of self-defense remains perfect and complete. So the question as to the existence of a limited or imperfect right of self-defense on the part of one who was not wholly and absolutely without fault in provoking the difficulty seems to depend upon the motive or intent with which he acted. And where a person's right of self-defense depends upon the intent with which he provoked a difficulty, and the intent is a fact to be found by the jury, the court should instruct the jury as to the distinction between perfect and imperfect self-defense as applied to the particular act of the slayer, and his liability whenever the evidence creates any doubt as to the character of such intent."

Wharton on Homicide (3d Ed.) p. 510, § 319.

[10] It cannot be gainsaid that the rights of the appellant in this case, although the

difficulty was provoked by his codefendant in whose defense he claims to have acted, are governed by the same principles of law as are applicable to the other defendant. See 1 Wharton on Homicide, p. 534, § 332.

We are of the opinion, therefore, that the lower court did not err in modifying the requested charge as was done.

### Bill No. 5.

[11, 12] The fifth bill was to a portion of the judge's general charge, in which it was said:

"Murder is the unlawful and felonious killing of a human being in the peace of the state (which means when the country is not at war and the person killed not an alien enemy) with malice aforethought, either express or implied."

The matter complained of was the definition of the phrase "in the peace of the state" contained within the parentheses in the above quotation. While the words used were a little misleading, and the definition imperfect, the same cannot be said to have injured the accused in any wise. The phrase in question means the same as that of "in the king's peace" under the English common law, and which is that the status of the deceased at the particular time and place was such that he was entitled to the protection afforded by the laws of the king or state for persons generally, and not actually engaged in waging war against the sovereign.

"Every human being who is, according to the old English phrase, in the peace of the king, by which is meant, in the enjoyment of the right of existence at the particular time and place, may be the subject of felonious homicide; 'as,' says Coke, 'man, woman, child, subject born, or alien, persons outlawed, or otherwise attained of treason, felony, or premunire, Christian, Jew, heathen, Turk or other infidel, being under the king's peace.'" 2 Bishop's New Crim. Law (8th Ed.) p. 356, § 630.

In other words, the expression is used to negative the idea that the deceased was actually engaged at the moment in waging war against the state; all others being entitled to the law's protection. 4 Blackstone, 198; 1 Bish. Crim. L. (8th Ed.) § 134; State v. Gut, 13 Minn. 341 (Gil. 315); State v. Dunkley, 25 N. C. (3 Iredell's Law) 116.

### Bill No. 6.

[13, 14] We find no reference to this bill in the brief, and it was not mentioned in oral argument; hence we conclude that it has been abandoned. It covers a charge to the jury in which they were instructed that, if they were not satisfied beyond a reasonable doubt that the accused were guilty of murder, but were convinced beyond such reasonable doubt that they were guilty of manslaughter, the verdict should be guilty of manslaughter. There was nothing objectionable in this charge.

### Bill No. 7.

[15-17] Defendant excepted to the following special charges given at the instance of the state, to wit:

"(1) Where a responsible person without authority and under such circumstances as indicate deliberation, without apparent provocation or necessity, wounds another in a vital part with a deadly weapon, then malice is inferred.

"(2) If it appear that the conflict was in any way premeditated by the defendant, self-defense cannot be set up.

"(3) If a party who originates or provokes a difficulty forfeits the right of self-defense, no person present aiding, abetting, and assisting such party with full knowledge of the facts can plead self-defense."

We have not been advised in what respect any of these instructions can be said to be erroneous, and we find nothing objectionable therein.

### Bill No. 8.

The eighth and last bill of exceptions was reserved to the overruling of defendant's motion for a new trial. The feature of the motion relied upon here is the alleged discovery of two new witnesses who would swear upon the new trial that the deceased had a pistol in his hand at the moment when he was shot, which fell to the floor beside his body.

[18-21] The paramount test of the importance of newly discovered evidence, which the trial judge, primarily, is required to determine, subject to review by this court, is: Would it likely produce a different result on another trial? In applying this test, we must assume that the second jury would follow the law as given them in charge by the judge. There seems to have been no dispute but that Gainey provoked the difficulty, with the present appellant standing by and having full knowledge of the circumstances; if so, then, as pointed out elsewhere in this opinion, he could no more be excused on the ground of self-defense than Gainey could. Therefore it would make no difference in law whether deceased had a pistol in his hand or not, since this would not affect the question of guilt, save to the extent of reducing the offense to manslaughter, if it were shown that Gainey went into the affray unarmed, with the bona fide intention of doing nothing more than engaging in a fist fight. Hence he has no ground to complain of the verdict of manslaughter, and to urge as the basis for a new trial alleged newly discovered evidence which could not legally change the result.

For the reasons assigned, the verdict and sentence are affirmed.

O'NIELL, C. J., concurs in the result, but not in the discussion of bills No. 4 and No. 5.