658 So.2d 703 (1995)
STATE of Louisiana, Plaintiff-Appellee,
v.
Eric T. WILLIAMS, Defendant-Appellant.
No. 26,716-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
Order On Rehearing July 27, 1995.
*704 Darrell R. Avery, Jonesboro, for defendant-appellant.
Richard Ieyoub, Atty. Gen., Walter E. May, Jr., Dist. Atty., James R. Hatch, Asst. Dist. Atty., for plaintiff-appellee.
Before MARVIN, NORRIS and BROWN, JJ.
NORRIS, Judge.
Eric Williams was indicted for the second degree murder of Desmian Demond Willis. La.R.S. 14:30.1. He proceeded to a jury trial after which he was found guilty as charged; this court, however, reversed the conviction because of inadequate jury instructions. State v. Williams, 606 So.2d 1387 (La.App.2d Cir.1992). He returned for a second jury trial after which he was again found guilty as charged. He now appeals, advancing 14 assignments of error. Although most of Williams's arguments do not present reversible error, we find merit in the one that challenges the sufficiency of the evidence. We therefore reverse the murder conviction, enter a conviction of manslaughter, and remand the case for resentencing.

Factual background
Sometime on the afternoon of May 1, 1991, Williams was driving his Ford Bronco and accompanied by his friends Chris Robinson and Torenzo Grider. They stopped by the home of Lisa Webb, where the victim Desmian Willis was visiting. Williams and Willis exchanged some words and argued until Robinson persuaded him to leave. They proceeded to a ball park further down the road.
Roughly an hour later, Williams and his friends rode back from the ball park. Williams parked the Bronco on the street near Webb's house, exited, and started walking toward her carport; Webb, Willis and several other persons were standing around. Williams was unarmed. The testimony of the incident is somewhat conflicting. According to Robinson, Willis simply knocked Williams flat on the driveway. Webb and Chris Turner, one of the youths gathered at Webb's house, testified that Williams took a swing but missed, and Willis responded by decking him. It is undisputed that after Williams was down, Willis stomped on his chest and spat in his face. Williams had to be helped up by Robinson and Grider; Grider testified that Williams was "in a daze." Williams's lip was cut and he was bleeding.
Williams got to his feet, stumbled back to the Bronco, and pulled out a 9 mm pistol. Angrily rebuffing Grider and Robinson's efforts to block him, Williams walked up to Willis in the front yard. The testimony again diverges over whether the two men grappled (as was reported by Turner and another witness, Gradie McDaniel), or whether Williams fired at Willis from a short distance (as reported by Webb, Robinson, and experts Dr. Mashburn and Mr. Beighley, who found exactly one gunpowder particle in Willis's clothing and none on the wound). Chris Robinson testified that the entire encounter lasted from 30 to 45 seconds; Chris Turner testified that between the time Williams left the Bronco and shot Willis was only a few seconds.
Willis died instantly as a result of the gunshot wound to his chest. Williams promptly went to the police station and turned himself in. He was arrested and subsequently indicted on second degree murder charges.

Discussion: Sufficiency of the evidence
By six assignments of error (Nos. 7, 8, 8a, 9, 11 and 12) Williams contests the sufficiency of the evidence.[1] When an appellant raises *705 both this issue and other trial errors, the reviewing court should first determine the sufficiency of the evidence, as the appellant may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if the evidence fails to meet the standard of appellate review.
The standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); La.C.Cr.P. art. 821; State v. Hearold, 603 So.2d 731 (La.1992); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (1992). The Jackson standard applies to cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. R.S. 14:30.1A(1); State v. Brooks, 505 So.2d 714 (La.), cert. denied 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Manslaughter is a homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. R.S. 14:31A(1).
Sudden passion or heat of blood distinguishes manslaughter from homicide. They are not, however, elements of the offense but mitigatory factors exhibiting a degree of culpability less than is present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La.1981). A defendant who shows by a preponderance of the evidence that these mitigatory factors are present is entitled to the verdict of manslaughter. State v. Lombard, 486 So.2d 106 (La.1986). However, the defendant is not obligated to establish the factors affirmatively; instead, the jury may infer them from the overall evidence presented. Id., at 110-11 fn. 9, citing State v. Tompkins, supra, and State v. Peterson, 290 So.2d 307 (La.1974). The reviewing court's function is to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d at 111, and citations therein.
A person who is the aggressor or who brings on the difficulty cannot claim self defense. R.S. 14:21. However, the fact that the defendant was the aggressor does not exclude the possibility of reducing his liability from murder to manslaughter. State v. Corneille, 153 La. 929, 96 So. 813 (1923). In fact, the courts frequently find manslaughter in cases where the defendant was the original aggressor. See State v. Lombard, supra; State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.), writ denied 634 So.2d 371 (1993).
The jury has great discretion to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied 499 So.2d 83 (1987).
We have closely reviewed the record evidence and are constrained to find that in the light most favorable to the State, a preponderance of the evidence shows a sudden passion or heat of blood from which the average person would not have cooled.
Several witnesses testified that Williams and Willis had argued an hour or so before the fatal shooting. Before he left the scene, Williams told Willis he would be back. Williams's companions established that when they returned to Lisa Webb's house, Williams walked up to Willis unarmed. The testimony is inconsistent as to whether the two men grappled. Either way, Willis knocked Williams down and then continued to assault him; Lisa Webb said Willis "stumped him," and Chris Turner said Willis "got on top of him." When Willis got through, Williams stood up, but witnesses *706 described him as "wheezy" and "dazed." He went to the truck, fetched a 9 mm pistol, and made his way back to Willis, while rebuffing his friends' efforts to stop him. Again, the testimony diverges; some witnesses say Williams simply walked up and shot Willis at close range; others say the men struggled, and the gun went off in the heat of the fight.
Notably, Chris Robinson testified that from the time Williams left the truck to the time the shot was fired was only 30 to 45 seconds. Chris Turner estimated that the entire incident took "just a few seconds."
Dr. Jay Mashburn, who performed the autopsy, found no gunpowder residue around the entry wound, indicating that the gun was anywhere from a few inches to two feet from the victim at the time of the firing. He added, however, that clothing could interfere with the presence of gunpowder. Richard Beighley, a criminalist at the North Louisiana Crime Lab, testified that Willis's T-shirt contained a bullet hole and one particle of gunpowder, indicating that the victim was at least four feet away from the end of the gun when the shooting occurred.
This evidence easily shows, in the light most favorable to the State, that Williams was initially the aggressor: after an argument with Willis, he left, threatened to return, and did in fact return an hour or so later. It is critical to note, however, that when he confronted Willis the second time, he was unarmed. Although the testimony is inconsistent, it shows that Williams confronted his victim and perhaps engaged him in a tussle. However, Williams was quickly and convincingly bested in this struggle; viewed in the light most favorable to the State and with due deference to the jury's factfinding function, Williams's effort was pitiful against the 6-foot, 180-pound high school football player Willis. Willis obviously humiliated Williams by decking him, stomping on his chest and spitting in his face. It is difficult to imagine more provoking conduct. Williams's reaction, fetching the gun and shooting his attacker, occurred in too short a time for his, or any reasonable person's, blood to have cooled. The intensity of Williams's resulting heat of blood is underscored by the very brief time involved and his senseless refusal of his friends' entreaties to back off.
On these facts, the jury could not rationally find that the mitigating factors of heat of blood or sudden passion were not shown by a preponderance of the evidence. State v. Lombard, supra. Further, even though Williams's aggressor status deprives him of the benefit of self defense, he did not set out to take Willis's life, and it is clear that "the deceased's attack put the defendant's life in danger," or at least in fear of great bodily harm, and thus does "not * * * militate against reducing the offense to manslaughter." State v. Corneille, 153 La. at 939, 96 So. at 816, quoting 1 Wharton's Crim.Law (11th ed.), § 613. In our view, Corneille`s analysis precisely foresees what occurred in the instant case. See also State v. Taylor, supra; State v. Sparrow, 612 So.2d 191 (La. App. 4th Cir.1992).
For these reasons we will reverse the conviction of second degree murder, enter a judgment of manslaughter and remand the case for resentencing.

Evidentiary rulings
By his first, second and fifth assignments Williams contests various evidentiary rulings by the trial court: the admission of Mrs. Willis's testimony as to her son's age, of a photograph of Willis taken some two years before his death, and of autopsy photographs of Willis's chest area.
On direct examination the prosecutor asked Willis's mother the date of his birth; she replied May 14, 1974, thus showing that he was 16 when he died. Williams urges, without elaboration, that under La.C.Ev. art. 401, this evidence was not relevant. We disagree; the challenged testimony was intended to help positively identify the victim for the jury, a legitimate function of the State's case. The State made no attempt to exploit the age difference between Willis (16) and Williams (22), thus we perceive no prejudice in the question and answer. We find no reversible error.
During Mrs. Willis's testimony, the State introduced a photograph (Exhibit S-3) of Willis taken a year or two before his death; *707 she testified that it depicted his likeness at the time of his death. Williams objected, urging the photo had no probative value and was prejudicial in nature. He now argues on appeal that admitting the photo was error because it showed Willis to be youthful and "clean cut"; that since there was other testimony to establish Willis's identity, this photo was unnecessary; and that since it was taken a year or more before his death, it did not accurately depict his appearance in May 1991.
Photographs are generally admissible if they illustrate any fact, shed light upon any issue in the case, or serve to describe the person, thing or place depicted. State v. Landry, 388 So.2d 699 (La.1980), cert. denied 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Perow, 616 So.2d 1336 (La. App. 2d Cir.), writ denied 623 So.2d 1303 (1993).
The high school photo obviously served to identify the victim for the jury and thus had probative value. While Williams argues that it did not accurately depict Willis at the time of his death, Mrs. Willis testified to the contrary. The photo itself merely depicts a young man posed before an artificial background. The fact that he looks "clean cut" does not make the image prejudicial. Cf. State v. Francis, 486 So.2d 346 (La.App. 3d Cir.), writ denied 492 So.2d 1216 (1986). We find no reversible error.
Williams also contests the admission of two autopsy photos (Exhibits S-5 and S-6) as irrelevant and prejudicial. Dr. Mashburn of the Coroner's Office testified that they depicted the gunshot wound to the victim's chest as observed during the autopsy. The trial court found that while they were cumulative of Dr. Mashburn's testimony, the photos were also relevant in identifying the location of the wound.
Photographs are admissible to corroborate other evidence of the manner in which death occurred and to establish the location and severity of the wound. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The instant photos showed no blood and were not gruesome or shocking. The trial court has great discretion in admitting photographs into evidence. Absent an abuse of that discretion, the ruling will not be disturbed. State v. Kelly, 362 So.2d 1071 (La. 1978), cert. denied 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); State v. Perow, supra. We perceive no abuse of discretion here. These assignments present no reversible error.

Testimony of the prior altercation
By his third assignment Williams challenges the admission of testimony regarding the first altercation between him and Willis. During trial, four witnesses described the earlier incident. One of these was Officer Lafitte, the assistant chief of police called to Webb's house to investigate a disturbance roughly an hour before receiving the homicide call to the same address. Also describing the altercation were Lisa Webb, Chris Robinson and Chris Turner. Williams timely objected to each portion of contested evidence. Citing La.C.Ev. art. 404B(1), Williams urges it was inadmissible evidence of other crimes, wrongs or acts. He further argues that because the testimony was used to prove his intent or motive, the State should have provided prior notice of the intent to use it in accordance with State v. Prieur, 277 So.2d 126 (La.1973).
The Code of Evidence prohibits the use of evidence of other crimes, wrongs or acts to prove the character of a person in order to show that he acted in conformity therewith. Art. 404B(1). The article further provides, however, that such evidence is admissible "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." This is commonly called the "res gestae" exception and we discussed its significance in the recent case of State in Interest of MSS, 612 So.2d 959, 963 (La.App. 2d Cir.1993):
Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the prosecution could not accurately present its case without reference to them. A close connexity in time and location is required between the charged offense and the other crimes evidence. (citations omitted)
*708 The close connexity requirement may, depending on the circumstances, encompass acts performed three or four hours before the crime. See State v. Brewington, 601 So.2d 656 (La.1992); State v. Mitchell, 572 So.2d 800 (La.App. 4th Cir.1990), writ denied 576 So.2d 47 (1991).
Williams and Willis exchanged heated words and created a disturbance that resulted in a call to the police. Williams left the scene, threatening to return, and did in fact return an hour or so later, fatally shooting Willis. The fairly short period of time between incidents and the circumstances of Williams's return to the same placethe escalating hostilitiessatisfy the connexity requirement. The earlier incident was so closely related to the charged offense that the State could not have accurately presented the case without referring to it. Thus the Prieur notice was not required and testimony regarding the incident was properly admitted. See State v. Griffin, 618 So.2d 680 (La.App. 2d Cir.), writ denied 625 So.2d 1063 (1993).

The responsive verdict
By his fourth assignment Williams contests the trial court's refusal to instruct the jury that negligent homicide is a responsive verdict to second degree murder. The judge clearly defined negligent homicide and criminal negligence, and instructed the jury that if they should find Williams guilty of the former, they must find him not guilty of the charged offense. Williams now argues that because the jury could not convict him of negligent homicide under the court's instructions, the jury had to disregard evidence of criminal negligence as it would mandate a finding of not guilty.
The only responsive verdicts which may be rendered to an indictment of second degree murder are guilty, guilty of manslaughter, and not guilty. La.C.Cr.P. art. 814A(3). The trial court is without authority to add to the statutory responsive verdicts. State v. Moseley, 587 So.2d 46 (La.App. 2d Cir.), writ denied 589 So.2d 1066 (1991). The trial court committed no error.[2] This assignment presents no reversible error.

Excluded testimony as to intent
By his sixth assignment Williams urges the trial court wrongly refused to let witnesses express their opinion of whether Williams intended to kill Willis. During cross examination of Chris Robinson, defense counsel asked if he believed Williams intended to shoot Willis. The State objected, urging improper foundation for the question. The trial court sustained, commenting, "I'm not saying that you can't get it in, I'm sustaining the lack of foundation." R. p. 371. Counsel then moved to a question about Willis's height. During the direct examination of Gradie McDaniel, defense counsel asked the witness's opinion as to what Williams's intentions were when he walked back toward Willis. The State again objected, raising improper foundation. The court sustained, and counsel concluded his questioning.
On appeal Williams urges the trial court erred in sustaining the State's objections, contending the solicited testimony was permissible as opinion testimony by a lay witness. La.C.Ev. art. 701.
We find, however, that counsel did not object to the court's rulings; rather, he resumed a new line of questions with one witness, and tendered the other for cross examination. Failure to object contemporaneously prevents the defendant from raising the error on appeal. La.C.Cr.P. art. 841; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 624 So.2d 1260 (La.App. 2d Cir. 1993), writ denied 93-2899 (La. 2/11/94), 634 So.2d 372. This assignment lacks merit.

Mental capacity
By his thirteenth assignment Williams contests the trial court's finding that he was capable to stand trial and knew the difference between right and wrong at the time of the incident. Prior to the first trial, Williams filed a request to appoint a sanity commission, and he was examined by Drs. Salmon and Haynes. Both doctors reported that he *709 was capable of standing trial and had no indication of mental illness.
A sanity hearing was then held. Dr. Salmon testified that Williams stated there were certain facts from the shooting incident that he did not remember. However, Dr. Salmon concluded that Williams knew the difference between right and wrong, and reiterated that there was no indication of mental illness. Dr. Haynes did not testify, but his findings were the same as Dr. Salmon's. Both physicians' reports were admitted as evidence at the hearing. The trial court ruled Williams had the capacity to stand trial.
After his conviction in the first trial, Williams asserted the findings of the sanity commission as error; this court reversed on other grounds. Now, appealing his second conviction, Williams again attacks the court's ruling that he was sane at the time of the offense and competent to stand trial.
When a defendant is tried upon a plea of "not guilty," evidence of insanity or mental defect at the time of the offense shall not be admissible. La.C.Cr.P. art. 651. Our review of the record shows that Williams never withdrew his plea of not guilty and entered the dual plea of not guilty by reason of insanity. Thus the issue of his sanity at the time of the offense was not properly before the trial court, and not before this court. We therefore will consider the argument only as it pertains to competence to stand trial.
A defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney or the court. La. C.Cr.P. art. 642. Williams requested a mental examination owing to his inability to remember certain periods of time on the night of the shooting. The two doctors examined him and found he was capable to stand trial and lacked indicia of mental illness. La. C.Cr.P. art. 645A(2) provides:
The fact that the defendant claims to be unable to remember the time period surrounding the alleged offense shall not, by itself, bar a finding of competency if the defendant otherwise understands the charges against him and can assist in his defense.
Louisiana law presumes that a defendant is sane and responsible for his actions; a defendant has the burden of proving by a preponderance of the evidence that he is incompetent to stand trial as a result of mental disease or defect. State v. Brooks, 541 So.2d 801 (La.1989). In light of art. 645A(2), his claimed memory lapse is not sufficient to show incapacity to proceed. Williams has presented no evidence to discredit the medical opinions or undermine the trial court's conclusion. For this reason we find no error in the court's ruling. This assignment lacks merit.

Conclusion
By his tenth assignment Williams asks the court to review the record for error patent. Such review is mandatory on the appellate courts. La.C.Cr.P. art. 920(2). We have reviewed the entire record and find nothing we consider to be error patent.
For the reasons expressed, we reverse Eric Williams's conviction of second degree murder, enter a conviction of manslaughter, and remand the case for resentencing in accord with this opinion.
CONVICTION OF SECOND DEGREE MURDER REVERSED; CONVICTION OF MANSLAUGHTER ENTERED; CASE REMANDED FOR RESENTENCING.
BROWN, J., dissents with written reasons.
BROWN, Judge, dissenting.
The use of standard phrases to set forth legal precepts occasionally lessens their import. In criminal cases, the appellate review standard prohibits a weighing of the evidence. Rather, legal sufficiency is the appropriate concern of the appellate tribunal. It is not within the province of the appellate court to reweigh conflicting testimony or retry the case. It is the duty of the appellate court to resolve all conflicts in the evidence and all reasonable inferences therefrom in favor of the verdict. A conviction should survive review whenever the evidence and its inferences, viewed in the light most favorable to the prosecution, would warrant the jury's finding the defendant guilty beyond a reasonable doubt. A verdict should be reversed or reduced only when the prosecution has clearly *710 failed to prove defendant's guilt. Jackson v. Virginia, supra.
Defendant was tried twice and convicted each time of second degree murder. This court reversed the first conviction solely on the basis that the trial court failed to give jury instructions concerning negligent homicide. State v. Williams, 606 So.2d 1387 (La. App. 2d Cir.1992).
The majority opinion fails to note several important factors supporting the jury's verdict. The defendant was twenty-one years old while the victim was sixteen. Immediately following the shooting and before leaving the scene, defendant told his cousin, "I thought the gun was on safety." At the police station, defendant gave statements again indicating that the gun accidentally discharged. Defendant did not testify at trial.
The defense was negligent homicide. The jury was presented with conflicting testimony and arguments to weigh in support of defendant's claim that the gun was discharged accidentally. In closing argument defense counsel stated:
... a tussle ensued, the gun was accidentally discharged ... (Emphasis added).
. . . . .
But, what's the first thing that Eric Williams said when he got back in the truck? He didn't say, well, I got him. He didn't say, I told him I'd be back. He didn't say anything like that. He said, I thought the gun was on safety.
. . . . .
There's not sufficient evidence for the state to prove beyond a reasonable doubt that Mr. Williams had the specific intent to kill Mr. Willis. If you do not find specific intent, then you cannot find Mr. Eric Williams guilty of either second degree murder, nor can you find him guilty of manslaughter.
No effort was made by the defense at trial to affirmatively establish the presence of "sudden passion" or "heat of blood", the mitigating circumstances that distinguish manslaughter from murder. Seconds after the shooting, defendant possessed the "self control" and "cool reflection" needed to formulate an accidental shooting defense. The majority has weighed the evidence and substituted its inferences for those that a reasonable juror could have drawn. In this case, a reasonable juror could have found from the evidence that defendant was bested in an attack that he himself initiated. A reasonable juror could have concluded from defendant's statements in the truck and at the police station that he did not act under sudden passion or heat of blood.
Little comfort can be found in the 1923 criminal case, State v. Corneille, supra, cited by the majority. Defendant's aggression is a factor in determining whether adequate provocation existed to reduce the killing to manslaughter. The jury clearly could have believed that this 21-year-old defendant aggressively advanced (for the third time) on the 16-year-old victim. Under these circumstances, a reasonable juror could have concluded that being bested in the encounter was not provocation sufficient to deprive an average person of his self control or cool reflection. The majority decision could be construed, although incorrectly, as supportive of the position that one who starts a fight, gets whipped and shoots the winner is to be rewarded with a lesser verdict than murder.
The majority opinion simply retries and reweighs the evidence, a process proscribed by our constitution. A rational juror could have found defendant guilty beyond a reasonable doubt of second degree murder, and concomitantly, not guilty of manslaughter.
I respectfully dissent from the reversal of the jury's verdict of guilty of second degree murder. In all other respects, I agree with the majority opinion except to supplement the discussion of assignment number 6 to state that it is the jury's duty to determine intent from the surrounding circumstances. A witness's opinion of defendant's intent is an improper assumption of the jury's responsibility.
BROWN, Judge, on rehearing.
In criminal cases, the appellate review standard prohibits a weighing of the evidence. Rather, legal sufficiency is the *711 appropriate concern of the appellate tribunal. It is not within the province of the appellate court to reweigh conflicting testimony or retry the case. It is the duty of the appellate court to resolve all conflicts in the evidence and all reasonable inferences therefrom in favor of the verdict. A conviction should survive review whenever the evidence and its inferences, viewed in the light most favorable to the prosecution, would warrant the jury's finding the defendant guilty beyond a reasonable doubt. A verdict should be reversed or reduced only when the prosecution has clearly failed to prove defendant's guilt. Jackson v. Virginia, supra.
The jury was instructed concerning the lesser and responsive verdict of manslaughter; however, the defense was negligent homicide. The jury was presented with conflicting testimony and arguments to weigh in support of defendant's claim that the gun was discharged accidentally.
Immediately following the shooting, and before leaving the scene, defendant told his cousin, "I thought the gun was on safety." Thus, seconds after the shooting, defendant possessed the "self control" and "cool reflection" needed to formulate an accidental shooting defense.
Defendant's aggression is a factor in determining whether the provocation, necessary to reduce the killing to manslaughter, existed. The jury clearly could have believed that this 21-year-old defendant aggressively advanced (for the third time) on the 16-year-old victim. Further, the shooting occurred after the fight had ended. Defendant was no longer engaged or in danger when he went to his truck and got his gun. Under these circumstances, a reasonable juror could have concluded that being bested in the encounter was not provocation sufficient to deprive an average person of his self control or cool reflection.
A rational juror could have found defendant guilty beyond a reasonable doubt of second degree murder, and concomitantly, not guilty of manslaughter.
AFFIRMED.
NORRIS, J., dissents with reasons.
MARVIN, J., dissents for reasons assigned by NORRIS, J.
NORRIS, Judge, dissenting.
I respectfully dissent for the reasons set forth in the original opinion and for the additional reasons herein stated.
The majority states the defense to the charge was negligent homicide. In fact, the defendant put forth alternative defenses: the shooting was accidental; the shooting was committed in the heat of passion. Obviously, and for good reason of record, the jury did not buy the accidental shooting theory.
The majority also states: "Immediately following the shooting, and before leaving the scene, defendant told his cousin, `I thought the gun was on safety.' Thus, seconds after the shooting, defendant possessed the `self control' and `cool reflection' needed to formulate an accidental shooting defense." The record, however, does not clearly show that the defendant made this statement "seconds" after the shooting. The testimony of witness Robinson shows that after the shooting, Williams just stood at the scene, Robinson grabbed the gun, then he and Williams went back to the Bronco. Robinson drove off, and the first thing that Williams said after getting back into the Bronco was, "I thought the gun was on safety." R.pp. 369-370. Lisa Webb, who largely corroborated Robinson's account of the incident, did not testify she heard Williams mention the gun being on safety while he was at the scene.
This is a classic manslaughter case: there is no evidence that Williams intended to kill or inflict great bodily harm upon Wilson until after Wilson knocked him down, stomped and spat upon him. Williams was unarmed when he first went by Lisa Webb's home and encountered the victim. He left and stayed away at the ballpark for approximately an hour. There were no threats by Williams to kill the victim. When he returned to Lisa Webb's house and got out of the Bronco, again he was not armed. Only after the victim knocked him down, bloodied his face, then stomped him and spat on him, did Williams stagger to his Bronco, get the gun and in anger despite the efforts of his companions *712 to dissuade him, shoot the victim. The record does verify that only a few seconds elapsed between the time Williams was knocked down, stomped, and spat upon, and the shooting.
On the undisputed facts, the jury could not rationally find that the mitigating factors of heat of blood or sudden passion were not shown by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986).
Finally, the repeated reference by the State to information outside the record in its application for rehearing is improper and hopefully was not considered in granting the rehearing.
NOTES
[1] Assignment 7 contests the sufficiency to prove specific intent; Assignment 8 urges the evidence supports only a conviction of negligent homicide; Assignment 8a urges the evidence supports only a conviction of manslaughter; Assignment 9 urges the verdict is contrary to the law and evidence; Assignment 11 urges the trial court should have granted the motion for post judgment verdict of acquittal; Assignment 12 contests the trial court's refusal to grant a new trial.
[2] We further note that Williams's prior conviction was reversed because the trial court offered no instruction regarding negligent homicide. State v. Williams, 606 So.2d at 1390. The instant jury charge fully defines negligent homicide and criminal negligence, and advises the jury that a finding of negligent homicide necessitates a verdict of not guilty of second degree murder.